ALFRED E. NELSON AND OTHERS v. CHESTER S. WILSON.[1]

April 17, 1953.

Nos. 35,901, 35,902, 35,903, 35,904, 35,905, 35,906, 35,907, 35,908, 35,909.

---

[1]Reported in 58 N. W. (2d) 330.

*J. A. A. Burnquist,* Attorney General, *John H. Burwell,* Assistant Attorney General, *Thomas M. Quayle,* Special Assistant Attorney General, for appellant.

*Smith, McLean & Peterson,* for respondents.

MATSON, JUSTICE.

Appeal by the commissioner of conservation from orders granting peremptory writs of mandamus directing him to institute eminent domain proceedings for the condemnation of certain lands allegedly taken by flooding caused by a water control project in Kandiyohi county.

The flooding complained of in these proceedings occurred in a low flat basin in Kandiyohi county in the area generally east of Green Lake and south of Lake Calhoun, which is about one mile east of Green Lake. An outlet, controlled by a dam, is located on the eastern side of Green Lake and is the source of the Little Crow River which flows in an easterly direction immediately to the south of Lake Calhoun. In about 1906 the channel of the Little Crow. River was deepened and straightened so as to be about 18 feet wide and eight feet deep. The improved channel was thereafter referred to as Kandiyohi county ditch No. 20. Another channel, extending from the south side of Lake Calhoun, flowed south and emptied its waters into ditch No. 20.

In 1936 the state of Minnesota, through its conservation commissioner, built two new dams in order to restore the marshy area

between Green Lake and Lake Calhoun in the furtherance of a fish propagation program. One of these dams was built in the Lake Calhoun channel, and the other was built in ditch No. 20 just west of the junction with the channel connecting ditch No. 20 with Lake Calhoun. In the original 1936 condemnation proceedings, the district court approved a maintenance of the water level behind both dams at the same elevation as that of the crest of the dam at the eastern outlet of Green Lake where ditch No. 20 begins. A project datum figure of 100 was assigned to this water level elevation. The court further allowed the acquisition of overflow rights to a height of two feet above elevation 100, that is, to contour elevation 102. The state, at that time, acquired fee or easement interests in the land thought to be affected by this water control project. Neither the relators herein nor their predecessors in ownership were parties to the 1936 condemnation proceedings in which a certificate of completion was filed in 1941.

The soil in the large flat basin south of ditch No. 20 is sandy. County ditch No. 9, dug in the 1890's, runs in an easterly direction through this basin (hereinafter referred to as the land above the dam). However, ditch No. 9 has always been too shallow to carry off the water with the result that the basin's natural drainage has always been northward into ditch No. 20. Since the subsoil is of a sandy nature, much of the surface water has seeped into the ground. From 1906, when ditch No. 20 was constructed, until 1940, when the pool behind the dam in ditch No. 20 was filled, the land in the basin was sufficiently dry to be used for pasture and for the growing of hay and small grain on an average of about seven out of eight years. The land below the dam in ditch No. 20 was also flat and used for growing small grain but had never been flooded prior to the construction of the water control dams in 1936.

In 1940, when the pool behind the dam in ditch No. 20 filled up, much of the land in the flat basin above the dam was flooded during the spring and summer months. Some of the land remained flooded the year around. The general flooding conditions prevailed from 1940 to 1948. In 1949 some of the land was still wet; other land,

although dry, had grown to cattails and bulrushes; and only a small portion of the land was being used for pasture and hay. The evidence shows that the flooding in the area above the dam was caused by (1) the saturated condition of the sandy subsoil caused by the high level of the pool which prevented the water which collected naturally in the basin from seeping into the subsoil and (2) by the backing up of water from the pool behind the dam in ditch No. 20. Much of the land in the basin is below contour elevation 102 and hence below the elevation to which the state acquired overflow rights. An expert witness testified that it was his opinion that seepage from the standing water would render the land useless to a height of two feet above the land actually flooded *or to contour elevation 104.*

The evidence shows however that the land below the dam in ditch No. 20 has also been frequently flooded. The water level behind the dams was maintained at a height in excess of elevation 100, and at times the logs would be pulled by some unknown person to permit the water to drain from the pool thereby causing the land below the dam to be flooded to contour elevation 100. This flooding occurred during April, May, and June in 1942, 1943, and 1944. The sudden release of the water washed out a private bridge belonging to one of the relators and toppled trees into ditch No. 20. The land remained wet until 1949, and not all of it had been placed under cultivation at the time of trial.

This appeal is taken from the trial court's orders granting peremptory writs of mandamus to compel the commissioner of conservation to institute eminent domain proceedings for the condemnation of all lands below contour 104.

Whether relators' lands were taken for a public use within the meaning of the state constitution depends here upon the evidentiary basis for, the extent and nature of, and the legal consequences to be attached to, the alleged invasion of these lands by:

(1) Overflowing through actual flooding and

(2) Underflowing or an undersurface invasion[2] which

(a) Raised the water table and saturated the soil with waters from without by a process of percolation, and which

(b) Through such raising of the water table blocked the drainage of surface and subsurface waters by seepage or percolation.

In determining whether relators' lands were taken we shall first consider the lands which naturally drain into ditch No. 20 and lastly the lands located below the dam.

## LANDS ABOVE THE DAM

■ Minn. Const. art. 1, § 13, which provides that private property shall not be taken, destroyed, or damaged for public use without just compensation,[3] has been implemented by a statutory authorization[4] (M. S. A. 117.01) for eminent domain proceedings wherein the word "taking" (M. S. A. 117.02, subd. 2) is defined to include every interference, under the right of eminent domain, with the ownership, possession, enjoyment, or value of private property. The evidence herein sustains a finding that relators' lands above the dam were *taken* up to elevation 104. As already noted, general flooding conditions prevailed from 1940 to 1948 to such an extent that much of the land was flooded during the spring and summer months and some of it was flooded the year around. As a result in 1949 some of the land was still wet and the land which had become dry had grown to cattails and bulrushes. Only a small portion was used for hay and pasture. The evidence indicates that the standing water in the pool behind the dam was maintained at a level which

---

[2]See, United States v. Kansas City Life Ins. Co. 339 U. S. 799, 70 S. Ct. 885, 94 L. ed. 1277; 2 Farnham, Waters and Water Rights, § 549; In re Minnetonka Lake Improvement, 56 Minn. 513, 519, 522, 58 N. W. 295, 296, 297.

[3]The federal constitution requires compensation only for a "taking." Minnesota, following the lead of many other states, in 1896 amended the constitution by adding the words, "destroyed or damaged" in order to avoid the hardships resulting from a strict interpretation of the word "taking" as construed under the federal constitution. See, 2 Nichols, Eminent Domain (3 ed.) § 6.44.

[4]Seabloom v. Krier, 219 Minn. 362, 366, 18 N. W. (2d) 88, 90.

not only caused a flooding up to elevation 102 but which by percolation raised the water table and continuously soaked the soil up to elevation 104 for such duration as to destroy the value of the land for farming purposes by preventing the growth of any ordinary agricultural crop such as hay or pasture grass. As early as in 1881 in Weaver v. Mississippi & R. R. Boom Co. 28 Minn. 534, 540, 11 N. W. 114, 115, this court, speaking through Mr. Justice Mitchell, said:

"It has been again and again decided to be the doctrine that overflowing land by backing water on it from dams built below constitutes a *taking*, within the meaning of the constitution, and that when real estate is actually invaded by superinduced additions of water, earth, sand, or other material, so as to effectually destroy or impair its usefulness, it is a taking within the meaning of the constitution."

In a later case, In re Minnetonka Lake Improvement, 56 Minn. 513, 519, 522, 58 N. W. 295, 296, 297, this court in effect recognized that a taking of land may also occur through underflowing or percolation when the water level is maintained at a height which renders lands so wet as to destroy or seriously impair the value for pasture or meadow. Unquestionably, land may be taken not only to the extent of the actual flooding but also to the additional extent that the flooding water by percolation raises the water table so as to soak the land to a degree and for a sufficient duration to destroy its agricultural value, and it is immaterial whether the destructive effects of such percolation results from an invasion of water from without or by a blocking of the normal drainage of surface and subsurface waters.[5] This principle was recognized by the United States Supreme Court in United States v. Kansas City Life Ins. Co. 339 U. S. 799, 810, 70 S. Ct. 885, 891, 94 L. ed. 1277, 1285, when in finding a taking of land it said:

"* * * The percolation raised the water table and soaked the land sufficiently to destroy its agricultural value. The continuous

[5]See, 2 Farnham, Waters and Water Rights, § 549.

presence of this raised water table also blocked the drainage of the surface and subsurface water in a manner which helped to destroy the productivity of the land. Whether the prevention of the use of the land for agricultural purposes was due to its invasion by water from above or from below, it was equally effective. The destruction of land value, without some actual invasion of the land and solely by preventing the escape of its own surface water, is not before us."

The state contends, however, that it was not the construction of the dams in the water control project that caused the extensive flooding complained of but rather that it was caused by the unusually high annual rainfall since 1940. While it is true that the average yearly rainfall for the years 1940 to 1948 was about 27.46 inches, or about four inches per year greater than the 46-year average for this area, the rainfall was not so unprecedented that we can say as a matter of law that the lands in question would have been flooded had the dams not been constructed. No evidence was introduced that other low lands in this watershed were similarly affected as was done in the case of Mitchell v. City of St. Paul, 225 Minn. 390, 31 N. W. (2d) 46. Furthermore, there is evidence that this basin was not subjected to such continuous flooding before the construction of the dams even in the years in which large amounts of rain fell year after year. We are of the opinion that the evidence sustains the court's finding that a taking had occurred up to elevation 104 in the basin which drained northward into ditch No. 20 above the dam.[6]

### LANDS BELOW THE DAM

In two respects the evidence of a taking of the lands below the dam is materially different from that relating to the lands above the dam. First, the flooding of these lands occurred over the years when some unknown person from time to time removed the stop

[6]See State, by Peterson, v. Bentley, 231 Minn. 531, 45 N. W. (2d) 185, for case dismissing state's contention of excessive rainfall causing flooding; McKenzie v. Mississippi & R. R. Boom Co. 29 Minn. 288, 13 N. W. 123, where the floods were caused by unusual, though foreseeable, high water.

logs in the dams above so as to release the stored-up water. Secondly, the evidence sustains a finding of flooding only up to elevation 100 which, pursuant to the testimony of an expert witness, would cause some further taking by percolation or seepage but only up to elevation 102.

The state takes the position that it is not responsible for any flooding below the dam because the stop logs were manipulated without its authority. This position is not well taken. The dams were constructed by the state with removable stop logs and with no provision for locking them in place. Without question the very purpose of having removable stop logs was to make it possible to control the water level in the pool above by releasing it to flow upon the lands below. The evidence shows that the state, through its supervisory employees, knew that the locks were being manipulated over a period of some years. Furthermore, commencing with 1939, the state kept systematic records of the height of the water above and *below the dam*. These reports, which disclosed the frequent flooding of the lands below the dam, necessarily conveyed to the state's engineers the knowledge that the locks were being manipulated with frequency. There is no evidence that the state took any timely or reasonable precaution to prevent such manipulation and consequent flooding. The operation of the dams was under the exclusive control of the state, and, in the light of the knowledge that must reasonably be imputed to its engineers and employees of the removal of the stop logs and of the consequent flooding of the lands below, coupled with an absence of any timely effort to correct the situation by locking the logs in place, the state should not now be heard to say that the stop logs were manipulated without its authority.

■ With respect to the lands below the dam, we do not have merely an occasional negligent trespass such as was the case in State, by Youngquist, v. Hall, 195 Minn. 79, 261 N. W. 874. There it was held that the injury to the landowner was not permanent and had resulted merely from the negligent construction of a bridge which, as a source of injury, could be eliminated without compelling

the state to institute condemnation proceedings to acquire a perpetual easement. Whether occasional flooding is of such frequency, regularity, and permanency as to constitute a *taking* and not merely a temporary invasion for which the landowner should be left only to a possible recovery of damages is a question of degree, and each case must stand on its own peculiar facts.

"The modern and prevailing view is that any substantial interference with private property which destroys or lessens its value, or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed, is, in fact and in law, a 'taking' in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remains undisturbed." 2 Nichols, Eminent Domain (3 ed.) § 6.3.

Here, since the land remained flooded and wet for several years, since a bridge and trees were swept away, and since the state had full knowledge of the flooding and had taken no timely steps to correct the situation by locking the logs in place at elevation 100, there is ample evidence to support the finding of a taking below the dam. The evidence, however, does not sustain a finding of a taking up to elevation 104 but only up to elevation 102 and the orders and findings of the trial court must be modified accordingly.

The orders of the trial court are affirmed subject to the exception that a taking of the lands below the dam shall be limited to elevation 102.

Affirmed as modified.