In the Matter of the Petition of Frank E. ZIMMER and Others for the Repair of County Ditch No. 9 of the County of Kandiyohi, Minnesota.

STATE of Minnesota, by the MINNESOTA DEPARTMENT OF NATURAL RESOURCES, Appellant,

v.

KANDIYOHI COUNTY, Acting By and Through its BOARD OF COMMISSIONERS, Respondent.

No. C1–82–1534.

Supreme Court of Minnesota.

Dec. 7, 1984.

subd. 2, as amended by Laws 1983, Chapter 247.

Hubert H. Humphrey, III, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., Donald A. Kannas, Tibor M. Gallo, Sp. Asst. Attys. Gen., St. Paul, for appellant.

George E. Hulstrand, Willmar, for respondent.

YETKA, Justice.

A petition was filed for repair of drainage ditch No. 9 situated in Kandiyohi County, Minnesota. The county board authorized the repair of the drainage ditch, and the state appealed the order to the district court and also commenced injunctive proceedings under the Minnesota Environmental Rights Act. The trial court denied the injunction and affirmed the county board's order for the repair of drainage ditch No. 9. We reverse and remand.

The land involved in this appeal is a shallow basin in Kandiyohi County lying generally east of Green Lake and south of Lake Calhoun. County Ditch No. 9 was established and constructed between 1890 and 1901. It runs east through this basin, but has never been adequate to drain it completely. As a result, the basin has always drained north towards Lake Calhoun. In about 1906, County Ditch No. 20 was built to drain Green Lake and Lake Calhoun. Ditch No. 20 runs between Lake Calhoun and the shallow basin (see the site map at Appendix I). After Ditch No. 20 was completed, the soil in the basin became dry enough to be used for pasture and growing crops.

In 1936, the State of Minnesota built two dams in Ditch No. 20. The dams were intended to restore a marshy area between Green Lake and Lake Calhoun in the furtherance of a fish propagation program. The state at that time acquired fee or easement interests in the land thought to be affected by this program. However, the dams interfered with the drainage of the shallow basin south of Ditch No. 20. This interference caused portions of the basin to be flooded in the spring and summer months. Therefore, some property owners brought proceedings for writs of mandamus directing the state to institute eminent domain proceedings for condemnation of their property. (Such proceedings are commonly referred to as "inverse condemnation" proceedings.) In *Nelson v. Wilson*, 239 Minn. 164, 58 N.W.2d 330 (1953), this court found that the dams had caused the flooding and ordered the state to condemn the affected land. The state began condemnation proceedings on 15 parcels. After the commissioner's award, all proceedings were appealed to the district court. The appeals were settled before trial, the state acquiring fee simple interests in three parcels and "flowage easements" on the remaining 12. The easements acknowledge that the state had operated dams in Ditch No. 20 so as to "collect and cast flood waters upon the (grantor's) land," and

granted to the state the right to maintain the dams at *established elevations.* The three parcels that were purchased in fee simple became part of a wildlife management area.

On February 3, 1960, the landowners in this case, or their predecessors in title, petitioned the Kandiyohi County Board for repair of Ditch No. 9. The landowners wanted to drain off water that collected on their land because of the dams in Ditch No. 20. The board appointed an engineer who recommended widening the ditch, deepening it up to 1 foot below its original depth, and removing some trees. The state appeared at a hearing on this recommendation and objected on the grounds that (1) 200 acres of state land would be damaged by the proposed repair and (2) the state had acquired flowage easements over some of petitioners' land by which those petitioners had "granted away their rights to have said property drained."

The board ordered that repair of Ditch No. 9 proceed essentially in accordance with the engineer's recommendation. On September 27, 1961, the state appealed the board's decision to the district court. The court dismissed the board's order on July 11, 1962, under three alternative holdings: (1) the proposed work was an improvement and not a repair, (2) the board failed to determine whether the widening and tree removal would require the taking of property not included when the ditch was established, and (3) the cost of repair exceeded the original benefits. There was no appeal of the district court's decision.

In the late 1970's, the landowners again petitioned for the repair of Ditch No. 9. The Board of County Commissioners held a hearing on the petition and appointed an engineer to prepare repair plans. The plans called for deepening the ditch approximately 1 foot below the depth of original construction. The Minnesota DNR participated in the hearing and objected to the repair. Nevertheless, the board granted the petition and ordered the ditch repaired according to the engineer's plans.

The state petitioned the district court for review of the board's determination pursuant to Minn.Stat. § 106.631 and sought to enjoin the repairs pursuant to the Minnesota Environmental Rights Act. The actions were apparently consolidated. At the outset of the trial, three factual issues were presented: the elevation of the ditch as originally *designed,* the elevation as originally *constructed,* and the impact on the environment resulting from the proposed repairs. Prior to trial, the court requested that engineers for both sides collect additional data in the field. As a result of this joint survey, the parties were able to agree on the original design depth, and the board's engineer revised his proposed repair depths, raising them by as much as 0.7 feet. However, the parties could not agree on a depth "as constructed" and that issue was tried.

After the trial, the court issued its findings of fact and conclusions of law. Its findings can best be understood by reference to the site map attached as Appendix II. The relevant findings are:

1. The design depth at the "section corner" was 1155.8 (presumably measured in feet above mean sea level).
2. The constructed depth at this point was 1155.9, 0.1 foot shallower than designed.
3. The design depth at the "shallow ridge" was 1155.0.
4. The constructed depth at this point was 1155.4, 0.4 feet shallower than designed.
5. The proposed repair would reduce water levels in the area by 0.4 feet, affecting 230 acres of area wetland. Portions of the area would be changed from Type 3 wetlands to Type 2 wetlands.

The court did not make any findings of fact or conclusions of law concerning the extent of the "flowage easements." On the basis of these findings, the court modified and affirmed the board's repair order, permitting "repair" of Ditch No. 9 to its orginally designed depth.

The threshold question in this appeal is whether the requested work would be an improvement or, as the trial court found, a repair of the ditch. Since we have determined that the work would be an improvement, the other issues raised in this case need not be discussed, although the state makes a strong argument that, on the basis of estoppel, prescription, or the flowage rights acquired by the state, the petition should be denied.

There are three separate proceedings applying to drainage of wetlands, all covered in Chapter 106 of Minnesota Statutes 1982. The first proceeding deals with the initial construction or establishment of a drainage ditch. The second deals with the improvement of an established ditch, and the third provides for the repair of established ditches.

The procedure for establishing a new ditch begins with the filing of a petition:

> Before any public drainage system or other improvement authorized by sections 106.011 to 106.661 is established, a petition therefor shall be filed with the county auditor * * *. Such petition shall be signed by not less than a majority of the resident owners of the land described in the petition or by the owners of at least 60 percent of the area of such land, exclusive of the holder of easements for electric or telephone transmission and distribution lines. * * * The petition shall state that the petitioners will pay all costs and expenses which may be incurred in case the proceedings are dismissed or for any reason no contract for the construction thereof it let.

Minn.Stat. § 106.031, subd. 1 (1982). The county board then appoints an engineer to make a preliminary survey to determine whether the proposed ditch is necessary and practical. Minn.Stat. §§ 106.071, .081 (1982). The engineer's preliminary report is considered at a public hearing. Minn. Stat. § 106.101 (1982). If it appears that the ditch is necessary and feasible and that it will promote the public health, the board orders a detailed survey and appoints viewers to assess the benefits and damages to affected landowners. Minn.Stat. § 106.-101, .141, subd. 1 (1982). In the survey:

> All ditch lines shall be surveyed in 100 foot stations and levels shall be based on standard sea level datum if practical. Bench marks shall be established upon permanent objects along the line of the drains, not more than a mile apart. All field notes made by the engineer shall be entered in bound field books and preserved by him.

Minn.Stat. § 106.121, subd. 3 (1982). The statute continues:

> In planning a public drainage system, the engineer may vary from the line and plan described in the petition as finally adopted by the board * * * at the preliminary hearing or from the starting point thereof, as he finds necessary for the proper drainage of the land likely to be assessed for the drainage system described in the petition and approved at the preliminary hearing. He shall have authority to survey and recommend the location of such branch ditch or ditches as may be found necessary. Where better results will be accomplished and more desirable outlets secured, the engineer may provide for the extension of the outlet, or he may provide for different parts of the drainage to flow in different directions with more than one outlet. It shall not be necessary for such ditches to connect if they accomplish the drainage of the area to be affected by the petition instituting the proceedings.

*Id.*, subd. 6. When the engineer and viewers have filed their final reports, another public hearing is conducted. If the reports are satisfactory, the ditch is established by an order of the board. Minn.Stat. §§ 106.-171, .191, .201 (1982).

The procedure for improving an established ditch also begins with the filing of a petition:

> [A] petition signed by not less than 26 percent of the resident owners of the property affected by the proposed improvement or over which the proposed improvement passes or by the owners of not less than 26 percent of the area of

the property affected by the proposed improvement or over which the proposed improvement passes shall be filed with the auditor.

Minn.Stat. § 106.501, subd. 1 (1982). Petitioners for an improvement must file a bond payable to the county in the event the improvement is not constructed. *Id.,* subd. 2. The statute governing improvements then adopts most of the procedures for establishing a ditch, including a preliminary survey and hearing, detailed survey, appointment of viewers, and final hearing. *Id.*

The procedure for repairing a ditch is much less involved than either the procedure for establishing a ditch or the procedure for improving one. The petition may be filed by a single party, and no bond is required. Only one engineer's inspection is required and only one public hearing. Minn.Stat. § 106.471, subd. 4 (1982).

Two sections of the "repair" statute are relevant to this appeal:

The term "repair" as used in this section means restoring all or a part of a ditch system as nearly as practicable to the same condition as when originally constructed or subsequently improved, including resloping of open ditches and leveling of waste banks if deemed essential to prevent further deterioration, and routine operations as may be required from time to time to remove obstructions and preserve the efficiency of the ditch.

\* \* \* \* \* \*

\* \* \* After the construction of a drainage system has been completed, the ditch authority shall maintain the same or such part thereof as lies within its jurisdiction and provide the repairs required to render it efficient to answer its purpose. The drainage authority shall cause such drainage system to be annually inspected, either by a committee thereof, or a ditch inspector appointed by the ditch authority, and, if the committee or inspector shall report in writing to the drainage authority that repairs are necessary on any ditch system and such report is approved by the drainage au-

thority, it shall cause such repairs to be made within the limits hereinafter set forth. The ditch inspector may be the county highway engineer.

Minn.Stat. § 106.471, subds. 1–2 (1982). Under the clear language of the statute, the work requested could not be a repair since it calls for digging a deeper ditch than was "originally constructed." The trial court held, however, that since the requested work would merely bring the ditch up to the specifications of the original plan, it constituted a repair.

The trial court relied on the case of *Taylor v. County of Sherburne,* 243 Minn. 303, 67 N.W.2d 827 (1954). In that case, Floyd Taylor and others petitioned the county board for the repair of a ditch under the repair provisions of the Drainage Act. The board ordered repairs that included lengthening and deepening the ditch. The ditch had not been originally constructed according to the engineer's plans; the new work placed the ditch in the exact condition called for in those plans.

Taylor was dissatisfied with the repairs and obstructed the ditch. The county brought an action to enjoin him from placing further obstructions. He defended on the grounds that the board was without jurisdiction to do the work it had done on the ditch because (1) the work was an "improvement" instead of a repair and (2) the cost of the repairs exceeded the amount permitted under the repair statute. The trial court granted the injunction and Taylor appealed. This court affirmed the trial court, holding that Taylor was estopped from challenging the board's jurisdiction and that the work was a "repair," not an "improvement."

The *Taylor* holding is, however, based on unsound reasoning. The court relied on two older cases to support its decision, *County of Brown v. Martinsen,* 153 Minn. 268, 190 N.W. 255 (1922), and *State ex rel. Kolars v. County Board of Polk County,* 151 Minn. 274, 186 N.W. 709 (1922). Those two cases were decided under a statute that defined repairs much differently than

the present statute. The present statute limits "repairs" to the extent of original construction. The former statute had a much broader definition:

> The repairs herein provided for shall be construed to include the taking from said ditch of sediment deposited therein, the removal of obstructions therein, *the widening and deepening thereof so as to answer its original purpose* or so as to provide for additional flow of waters caused by other ditches or any other reason, the cutting and removal of weeds or grass from the bottom, sides, banks, or right of way of such ditch *and such other changes or alteration therein as will enhance its usefulness for the purpose of drainage, and shall further be construed to include the extension of said ditch to a new outlet* when and in case the same is found by the county board to be necessary or advisable.

Minn.Stat. § 5552 (1913) (emphasis added).

The court in *Taylor* stated that the former definition of repair was "similar" to the present definition. 243 Minn. at 307, 67 N.W.2d at 830. This is plainly wrong: the former definition was based on original *purpose* while the present is based on original *construction*. The former definition was much more liberal. Since *Taylor* is based on a misinterpretation of authorities, it cannot support the trial court's decision in this case and is expressly overruled.

The changed definition of repair from the old statute to the present statute indicates a legislative intention to restrict the scope of "repairs." This intention should be honored by adopting a literal interpretation of the statute and limiting "repair" work to the extent of original construction. This court has indicated its acceptance of a literal interpretation on two separate occasions. In *Seidlitz v. County of Faribault,* 237 Minn. 358, 55 N.W.2d 308 (1952), the court stated:

> In a proceeding for repair, under § 106.-471, the principal objective is to clean out and restore the drainage system to its *original condition.* Subd. 1(a) of that section defines the word "repair" as meaning "restoring a ditch system or any part thereof as nearly as practicable to the same condition as when originally constructed * * *."

*Id.* at 363, 55 N.W.2d at 312 (emphasis in original). In *Johnson v. County of Steele,* 240 Minn. 154, 60 N.W.2d 32 (1953), the court made a similar statement:

> There is a fundamental difference between a "repair" proceeding and an "improvement" proceeding both substantively and procedurally. Substantively, a "repair" proceeding contemplates only the restoration of the ditch to its original condition without in any manner changing or altering its channel.

*Id.* at 158, 60 N.W.2d at 36. *Taylor* failed to consider either of these cases.

The work petitioned for in this case exceeds the original construction so it is an improvement, not a repair. The county board's order for repair should be vacated because it does not comply with the statutory requirements for improving a ditch, Minn.Stat. § 106.501 (1982).

Reversed and remanded.

APPENDIX I

NORTH

NOT TO SCALE

LAKE CALHOUN

GREEN LAKE

COUNTY

DITCH

DAMS

NO. 20

LANDS SUBJECT TO FLOWAGE EASEMENTS

COUNTY

STATE PROPERTY

DITCH NO. 9

COUNTY ROAD NO. 138

APPENDIX II

NORTH

NOT TO SCALE

STATION 155.60

SECTION CORNER

COUNTY DITCH 9

FLOW →

.29 | 28
32 | 33

COUNTY ROAD NO. 138

R. 33 W.

SHALLOW RIDGE

SHALLOW RIDGE

DITCH BEGINS

STATION 113.70

T. 121 N.

WETLAND

DIETRICH LANGE WILDLIFE MANAGEMENT AREA

DITCH

TODD, Justice (dissenting).

I dissent.

The majority opinion lists five relevant trial court findings. The trial court made no such findings. In its conclusions of law the trial court stated:

1. The elevation of County Ditch No. 9 as originally constructed is 1155.9 at Station 155.60 on the project plans, and 1155.4 at Station 113.70 on the project plans.

2. The elevation of County Ditch No. 9 as designed is 1155.8 at Station 155.60 on the project plans, and 1155.0 at Station 113.70 on the project plans.

3. The amended plans of the project engineer for County Ditch No. 9 are approved and adopted. The plans constitute a repair. The elevation as originally designed is 1155.8 at Station 155.60 and

1155.0 at Station 113.70 on the project plans.

The net result is that at Station 155.60 the original construction was .1 foot higher than the design elevation at Station 113.70. The original construction was .4 foot higher than the design elevation.

The DNR claimed that a reduction of .4 foot in the ditch would result in the drainage of 230 acres of wetlands and a possible reduction from type 3 wetlands to type 2 wetlands. The trial court never accepted this evidence as true. It stated that if it assumed the evidence to be true, it made no difference.

The majority contents itself with an overly literal reading of Minn.Stat. § 106.471 (1982) and, in doing so, reverses our court's interpretation of the statute which has stood unchallenged for over 30 years. In *Taylor v. County of Sherburne*, 243 Minn. 303, 67 N.W.2d 827 (1954), this court properly interpreted the statutory definition of "repair" as permitting work to restore a drainage ditch to its original design. *Id.* at 307, 67 N.W.2d at 830. That decision made sense.

The majority contends that prior to the enactment of Minn.Stat. § 106.471, subd. 1 (1982), the statutory definition of "repair" was based on "original purpose." While that may be, I do not believe the present statute is based on "original construction." The current statute states:

The term "repair" as used in this section means restoring all or a part of a ditch system as nearly as practicable to the *same condition* as when originally constructed or subsequently improved * * *.

M.S. § 106.471, subd. 1(a) (emphasis supplied).

The language of the statute clearly refers to restoration as nearly as possible of the original *condition* of the ditch. Nothing in the statute limits the repair of the ditch to its original construction. The original condition of the ditch was such that it was free of obstacles or cave-in which precluded the flow of water. A repair is de-signed to restore this condition. In drafting the present repair statute, I do not believe the Legislature was aware of the emphasis which might be placed on the words, "as when originally constructed."

The majority correctly observes that the present definition of "repair" is more restrictive than its statutory predecessors. *See, e.g.,* Minn.Stat. §§ 106.48, .49 (1941). Prior to 1945, there was, in fact, no separate statutory definition of "repair." *Compare id. with* Act of March 9, 1945, ch. 82, § 1, 1945 Minn.Laws 124, 124. "Repairs" and "improvements" were not distinguished. *See* Minn.Stat. §§ 106.48, .49 (1941). The majority, however, incorrectly concludes that restoration of a ditch so that it conforms with the engineer's design plans is an "improvement."

Although "widening and deepening" a drainage ditch so that it served its "original purpose" was a "repair" prior to 1945, the classification of similar work as either a "repair" or an "improvement" under Minn. Stat. §§ 106.471, .501 (1982) should depend on whether that work exceeds the specifications contained in the engineer's plans, not on whether it exceeds original construction. In reaching its decision, the majority ignores the importance of the engineer's design plans under the Minnesota Drainage Code, Chapter 106.

An examination of the code reveals that:

(1) The order of the county board which establishes a drainage ditch is based on the engineer's plans. Minn.Stat. § 106.201, subd. 2 (1982).

(2) The contract for construction must provide that the work will be performed according to the engineer's plans and specifications. Minn.Stat. § 106.221, subd. 1 (1982).

(3) The engineer must approve any bid for the construction work to ensure that it complies with the plans. Minn.Stat. § 106.231, subd. 4 (1982).

(4) The county board or court has the duty to make sure that construction work conforms to the plans and speci-

fications. Minn.Stat. § 106.261 (1982).

(5) Bridges and culverts must be constructed and maintained in accordance with the engineer's plans. Minn.Stat. § 106.271 (1982).

(6) If circumstances require any deviation from the engineer's plans during construction, those plans must be modified to reflect the changes. Minn.Stat. §§ 106.221, subd. 2, 106.-121, subd. 8 (1982).

(7) It is the engineer's duty during construction to inspect the work so that it is performed according to the plans, specifications and contract for construction. Minn.Stat. § 106.281 (1982).

(8) Payment on the construction contract is conditioned upon an engineer's report that the completed ditch conforms to the plans. Minn.Stat. § 106.331 (1982).

(9) Finally and most importantly, the assessments on benefitted properties are based on the establishment order, which in turn is based on the engineer's plans. Minn.Stat. §§ 106.201, subd. 2, 106.341, subd. 1, 4 (1982).

From my review of the Drainage Code, I believe it is highly unlikely that the Legislature intended the words, "as when originally constructed," to be distinguished from "as originally designed". Since the Legislature clearly intended drainage ditches to be constructed as designed, and any changes during construction to be reflected in the design plans, the majority's view of Minn.Stat. § 106.471, subd. 1 (1982) distorts the statutory plan.

There is a good, practical, common-sense reason for the court's ruling in *Taylor*. The design ditch is the only record of the depth of county ditches kept by the county recorder's office. It is the basis on which the viewers, appointed to determine to what extent property owners have been benefited or damaged, make their judgment and eventual assessment. The Minnesota Drainage Code, Chapter 106, makes no provision for reviewing the depth of a

ditch after construction is completed. Rights are fixed in relation to the documents describing the design of the county ditch. Over the years the constructed depth is altered by accretion and erosion of the drainage ditch bed. The constructed depth, therefore, cannot be used as a benchmark to determine the originally constructed depth for purposes of the repair statute.

Under the majority's decision a number of problems will arise. If a contractor fails to construct a ditch in compliance with the design plans and the reviewing engineer fails to note that error, property owners who later discover the difference will be left without a suitable remedy. Although the landowners will have been assessed for benefits on the basis of the design plans, they will be forced to petition for an "improvement" in order to have the ditch dug according to plan.

The present case vividly illustrates the difficulties encountered in attempting to define a repair in the absence of adequate records. The ditch involved in the present proceeding was constructed at the turn of the century. At that time, the recording of ditches was made only in reference to the existing grade. Minn.Stat. § 7795 (1894). As a consequence, the engineers for the parties in this case had difficulty in agreeing upon the design depth of Ditch No. 9. While they did eventually agree upon the design depth, they were unable to agree on the depth of the ditch as "originally constructed".

In 1917, the Legislature amended the ditch recording statute to require that records of design plans be made in reference to objective benchmarks. Act of April 23, 1917, ch. 441, § 5, 1917 Minn.Laws 692, 695. Thus, interpreting the definition of "repair" set forth at Minn.Stat. § 106.471, subd. 1 (1982) as permitting restoration of a ditch to its original design will virtually eliminate disputes over the permissible extent of a repair to a ditch established after 1917. Reading the legislative definition of "repair" as permitting restoration of a

**276**

ditch only to its originally constructed condition, however, will not only upset the rights of property holders, but invite litigation as well.

The Legislature established a procedure designed to make repairing a ditch inexpensive and uncomplicated. The majority's decision will surely frustrate that intent. Although design plans and specifications are recorded, no records are kept to show how a ditch was originally constructed. The extent of original construction, therefore, must be determined in order to establish the permissible limits of a ditch repair. As the present case illustrates, determining the extent of original construction may result in costly and protracted litigation. The unlucky farmer who seeks to repair a drainage ditch may soon realize that the cost of procuring expert testimony and legal counsel will make the ditch repair prohibitively expensive.

The overruling of *Taylor* at this time is particularly unfortunate. Drainage ditches fulfill a vital function in our rural areas. We have previously recognized that once a drainage ditch has been established and owners of the affected properties have been assessed for its construction, their rights in the ditch are vested constitutional rights. *Lupkes v. Town of Clifton,* 157 Minn. 493, 196 N.W. 666 (1924). Our rural community is under substantial financial pressure at this time. Further increasing their operational costs cannot be justified. *Taylor* correctly held that restoration of a ditch to its original design is a "repair" under Minn.Stat. § 106.471, subd. 1 (1982). The majority's decision is regrettable. I would affirm the trial court.

SCOTT, Justice (dissenting).

I join in the dissent of Justice Todd.