Anthony CAPONI, Appellant,

v.

Arnold CARLSON, et al., Respondents,

City of Eagan, Respondent,

Bonestroo, Rosene & Anderlik, et al., Defendants.

No. CO–86–44.

Court of Appeals of Minnesota.

Aug. 26, 1986.

Review Denied Oct. 29, 1986.

Thomas J. Rooney, Rooney & Neilson, Ltd., St. Paul, for appellant.

Edward Meisinger, Jr., Meisinger & Meisinger, West St. Paul, for respondents.

Kevin Eide, Hauge, Smith & Eide, Eagan, for respondent, City of Eagan.

Heard, considered and decided by PARKER, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

PARKER, Judge.

This appeal is from a trial court's determination that the City of Eagan did not take appellant Anthony Caponi's land for use as a storm water holding pond without compensating him. Caponi contends the city's action in designating a portion of his property as a storm water retention pond and the subsequent operation of the pond constitute a taking in violation of the U.S. Constitution, amend. V, and Minn. Const. art. 1, § 13. Respondents filed notices of review claiming that (1) by requesting a bifurcated trial and proceeding on the taking issue, Caponi waived his claim against the remaining defendants; (2) the action is barred by the statute of limitations and the doctrine of laches; (3) damages are barred by the "reasonable use" doctrine; (4) damages should be reduced to reflect the benefit to Caponi; (5) the finding of no taking is res judicata as to the city's liability for damages in a negligence theory; and (6) the evidence does not support the damage determination. We affirm in part, reverse in part, and remand.

## FACTS

Caponi commenced this lawsuit in 1978, claiming that a portion of his land, once intermittently wet and dry, is now permanently flooded and unusable. He sued Arnold Carlson, an adjoining property owner, and the developers of Carlson's property, accusing them of purposely flooding his land by damming the outlet that had channeled the natural flow of water off Caponi's property. The engineering firm that designed and installed the city's storm water drainage system was also included as a defendant. Caponi also sued the City of Eagan, alleging that it took a portion of his land for use as a storm water holding pond without compensating him in violation of U.S. Const. amend. V and Minn. Const., art. 1, § 13.

Caponi settled with some of the defendants before trial and executed *Pierringer* releases as to the city's engineering firm, Tilsen Homes, and Robert Tilsen individually. After the first part of a bifurcated trial, the district court determined that there was no taking. Caponi appealed that finding to this court. We dismissed as premature because the damage issue had not been litigated. Following the second trial on the damage claim, the trial court found that Caponi sustained $55,000 in damages and that Carlson, the city, Tilsen, and the engineering firm were each 25 percent liable. The trial court denied the parties' request for amended findings. This appeal followed.

Caponi purchased land and built a home in Eagan in 1950. In 1957 he purchased an additional 43 acres south of his homesite that is the subject of this appeal. Caponi testified that he fenced the 43 acres and began grazing cattle on it in 1970. Quigley Lake (also known as Caponi's Pond or L.P.–43) is located on his land. Caponi owns nearly all the bed of the pond except for a small portion owned by Carlson. Caponi testified that the pond was wet only part of the time and referred to it as a swamp.

In about 1915 or 1916, an area property owner dug a drainage ditch between Quigley Lake and Carlson Lake, a small pond to the south. The ditch was about one foot deep and one foot wide near Caponi's pond and gradually expanded to four feet deep and one and a half feet wide near Carlson Lake. In the spring, water from Caponi's pond would rise and flow through the ditch for about two weeks. Between 1916 and 1974, the water level of Caponi's pond fluctuated. Occasionally the pond basin would remain underwater throughout the summer. Sometimes a portion of it would remain flooded while other areas would become dry enough to till. At other times the pond would dry up completely. Caponi testified that until 1974 he had access to all of his land and would only "get his shoes wet walking the fence line." Caponi installed a new fence in 1970 that is now nearly submerged.

In a 1972 report on storm water drainage, the city designated about 12 acres of Caponi's property as a storm water retention pond. This report, prepared by the city's consulting engineers, was adopted by the city. At trial one of the city's engineering consultants testified that holding ponds are a less expensive method of storm water drainage than other options, such as storm sewer pipes. The report included a layout of the storm water sewer trunk system, ponding areas and drainage districts. It also established pond high-water levels and set the required storage amounts.

The report contained some cost estimates but did not include expenses for acquisition of ponding easements. The report stated:

It has been assumed in all cases that the necessary ponding areas will be dedicated for drainage purposes and therefore land costs are not included in the cost estimates. In most cases, land designated for ponding area is of marginal quality and this should be taken into consideration if acquisition is necessary.

During the fall of 1974, respondent Carlson constructed a berm across the drainage way at the northwest corner of Quigley Lake on his own land. Carlson testified that he constructed the berm without the participation of any other parties. Caponi claimed Carlson told him the berm would only be temporary and that he would eventually restore the natural drainage.

However, during the summer of 1976 Carlson eliminated the drainage ditch at the south entry to Carlson Lake. At the same time, Carlson began developing land in this area into a community of single-family homes. As part of its plat approval procedure, the city required streets and utilities to be constructed consistent with the storm water drainage plan and also required installation of an outflow culvert from Quigley Lake. The city's consulting engineers determined that the outflow elevation prior to Carlson's dam construction was at an 850–foot elevation. The city initially planned for the new outflow culvert to be placed at the same elevation. The culvert was built at 851.06 feet.

A 12–inch outlet pipe was constructed in 1977. By that time, inlet pipes had also been installed. All this was done without required permits from the Department of Natural Resources (DNR). The water remained standing in the pond, and since 1978 the water level has held fairly constant at 851.2 feet above sea level. According to a DNR report, the pipe is the only outlet from the lake and controls its elevation. The pond is now permanent.

The city prepared another storm water drainage report and master plan in 1978. This plan included an inventory of existing ponds, including Quigley Pond. According to the 1972 report, approximately 134 acres of land drained into this pond. The city claims that by 1978 that figure had been reduced to 113 acres.

In response to this lawsuit, the city requested that the DNR set the Ordinary High Water Level (OHWL) for Quigley Lake and asked for a permit to maintain the 12–inch outflow culvert as a part of the city's storm sewer system. The OHWL is defined as the

* * * elevation delineating the highest water level which has been maintained for a sufficient period of time to leave

evidence upon the landscape, commonly that point where the natural vegetation changes from predominantly aquatic to predominantly terrestrial.

Minn.Stat. § 105.37, subd. 16 (1986).

The district court then referred the case to the DNR for a determination of the OHWL both before and after storm sewer installation. On January 29, 1981, the DNR determined that the OHWL of Quigley Lake between 1915–16 and 1974–76 was at an elevation of 851.3 feet above sea level.

Caponi appealed this determination, claiming the method used to determine the OHWL does not comply with Minn.Stat. § 105.37, subd. 16. On June 4, 1981, the hearing examiner, interested parties, and Caponi visited the site. Subsequently, the hearing examiner affirmed the determination of the current OHWL at an elevation of 851.3 feet. He also determined that the pre–1974 OHWL of the pond was between 849.8 feet and 851.3 feet. He concluded that present water should be maintained because, if the lake were lowered, the area would not revert to its former wetland ecology due to surrounding residential development.

Various surveys, topographic maps and aerial photographs show little change in the size and shape of the pond bed over the years. However, the volume of standing water in the pond has increased significantly. In addition to the city's storm water projects, land use in the area surrounding Quigley Lake has changed from predominantly agricultural to predominantly residential. Nearly all the surrounding land has been completely developed. This also serves to increase run-off and the amount of water that spills into the lake.

## ISSUES

1. Did the city's designation of appellant's property as a storm water holding pond constitute an uncompensated taking?

2. Did the city's operation of a storm water holding pond on appellant's property constitute an uncompensated taking?

3. Does the evidence support the damage determination?

## DISCUSSION

### I

Caponi contends the designation of his property as a storm water holding area and its inclusion in the city's Storm Water Management Plans constitute appropriation for public use, thus, a taking.

It is well settled that a city or governmental entity can plan and regulate for the public good. When this goes beyond the limits of planning and impermissibly encroaches upon property rights, it will give rise to a taking claim. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (if regulation goes too far, it will be considered a taking).

We do not address the issue of whether designation of Caponi's property as a storm water holding pond in the city's plan constitutes a taking, because the record clearly shows the city went far beyond mere designation; the city implemented its plan and used Caponi's property as a holding pond. *Spaeth v. City of Plymouth*, 344 N.W.2d 815 (Minn.1984).

### II

The fifth amendment to the United States Constitution states:

[N]or shall private property be taken for public use, without just compensation.

This clause applies to state and local governments through the due process clause of the fourteenth amendment. *Chicago B & Q.R.R. Co. v. City of Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

The Minnesota Constitution also includes a taking clause, which provides:

Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured.

Minn. Const., art. 1, § 13.

Caponi argues that the city's ratification of Carlson's blockage of the drainage ditch

amounts to a taking. The city disagrees and argues that its construction of two culverts that empty into the pond owned in part by Caponi did nothing to increase the natural surface water draining onto his land. It claims that any damage to Caponi's property was caused by the downstream developer who first constructed a dam without the city's consent. The city claims construction of the culverts reduced the damage caused by downstream development and thus benefits Caponi.

*Spaeth v. City of Plymouth*, 344 N.W.2d 815 (Minn.1984), and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), compel this court to reverse the trial court's finding that no taking occurred. In *Spaeth* the Minnesota Supreme Court held that a landowner was entitled to compensation because the city, while implementing its plan for a municipal storm water holding pond, flooded a portion of his property. *Spaeth*, 344 N.W.2d at 820.

*Loretto* involves a New York law requiring a landlord to permit a cable television company to install its cable facilities on the landlord's property. The building owner claimed this constituted a taking. The U.S. Supreme Court held that a "permanent physical occupation" authorized by government is a taking without regard to the public interests it serves. *Loretto* at 426, 102 S.Ct. at 3170. The court discussed some of the principles and historical treatment of the taking clause, citing *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and pointed out that there is no "set formula" to determine whether compensation is constitutionally mandated for government restriction of property. *Id.* at 124, 98 S.Ct. at 2659.

The court in *Loretto* pointed out:

Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. * * * When faced with a constitutional challenge to a permanent physical occupation of real property, this court has invariably found a taking.

*Loretto* at 426, 427, 102 S.Ct. at 3170, 3171.

The court has always found a taking in flooding cases involving a permanent physical occupation of another's land. *Id.* at 428, 102 S.Ct. at 3172.

Caponi's property has been permanently flooded and is now used to hold storm water. This was done according to the city's plan and with its approval. The evidence substantiates Caponi's claim that it was the city's actions which permanently flooded his land.

The record shows that Caponi's land was designated as a depository for storm water in 1972—two years before Carlson's construction of the dam. The city ratified Carlson's 1976 blockage of the outflow ditch by approving his plat for development of the site.

The evidence establishes that the city did more than merely adopt plans and recognize the existence of a pond. In 1977 the city installed a 12-inch culvert at the corner of Quigley Lake that is the only outlet and controls its elevation. The city also installed two storm sewer pipes bringing water into the lake, which vastly increased the water volume. The installation of the outflow pipe was at an elevation *higher* than the pre-1974 run-off elevation which, in effect, determined the elevation. Instead of lowering the water level or alleviating the flooded condition, the city took steps to ensure that Caponi's property would serve as a permanent storm water holding pond.

The city's involvement in taking Caponi's land culminated in 1979 when it applied to the DNR for permission to keep Quigley Lake at its current, higher level. The DNR conditioned its approval of the city's request on the city acquiring title to the property. By requiring the city to compensate Caponi for the land it took, we require it to comply with the conditions imposed by the DNR.

Minn.R.Civ.P. 52.01 provides that, in actions tried without a jury, the trial court's

findings will not be set aside unless clearly erroneous. Under this rule, the district court's findings may be set aside if the appellate court, on review of the entire evidence, is firmly convinced that a mistake was made. *Minn. Public Interest Research Group v. White Bear Rod & Gun Club*, 257 N.W.2d 762, 782–83 (Minn.1977).

■ The trial court's finding stated, "No action by the city has been taken to implement its storm water management plan." The record shows that the City of Eagan physically appropriated a portion of Caponi's property for public purpose according to its plans. It is well settled that one's right to the use and enjoyment of property can be limited by reasonable regulation. Such regulation does not amount to a taking unless it deprives the property of all reasonable use. *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Caponi's land, which was intermittently wet and dry, is now permanently flooded; it was sometimes tillable and suitable for grazing cattle. He fenced the land. This fence is now under water. Caponi's land under Quigley Pond is now completely beyond his control. He has no use of the property.

■ Therefore, under these facts, we reverse the trial court and hold that the city took Caponi's property without compensation in violation of U.S. Const. amend. V and Minn. Const., art. 1, § 13.

### III

■ Having established there was a taking, we now turn to the issue of damages. In eminent domain cases, the measure of damages is ordinarily the difference between the market value of the entire tract before the taking and the market value of what is left after the taking. *Alexandria Lake Area Service Region v. Johnson*, 295 N.W.2d 588, 590 (Minn.1980). This court has reiterated the standard:

> The general rule for damages in a condemnation action is that the owner is entitled to the difference in market value immediately before the taking and the market value of the remaining tract after

the taking, excluding from consideration general benefits and deducting special benefits.

*City of Chisago City v. Holt*, 360 N.W.2d 390, 392 (Minn.Ct.App.1985) (citations and emphasis omitted).

■ Caponi's appraiser testified that property in the area is valued at $9,000 per acre. He estimated Caponi lost eight acres worth $72,000. He subtracted a special benefit of $8,250 for the additional lakeshore value to the remaining lots and concluded that Caponi suffered $63,500 in damages. Respondents' appraiser valued the land at $8,316 per acre and said Caponi's remaining land would increase in value by $1,000 per acre and concluded that Caponi sustained *no* damages as a result of his land being flooded.

The trial court found Caponi's entire property was damaged in the amount of $1,300 per acre and found damages of $55,000. We cannot say this finding is clearly erroneous. The trial court's figure is within the range provided for by the appraisers.

### DECISION

The matter is remanded to the trial court for entry of judgment consistent with this opinion and for a determination of attorney's fees and costs in the trial court and on appeal.

Affirmed in part, reversed in part, and remanded.