Roger LOVE, et al., Appellants,

v.

BURLINGTON NORTHERN, INC., Defendant,

The. Red Lake Watershed District, Driscoll Bros., Respondents.

No. C2–86–1731.

Court of Appeals of Minnesota.

June 9, 1987.

. Harold G. Myhre, Warren, for appellants.

Neil A. McEwen, Thief River Falls, for Red Lake Watershed Dist.

Raymond J. German, East Grand Forks, for Driscoll Bros.

Heard, considered and decided by PARKER, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

SEDGWICK, Judge.

The Red Lake Watershed District (the "Watershed District") granted the Driscoll

Brothers a permit to install a culvert decreasing the water flow in a private drainage ditch used by appellants. Appellants seek an injunction directing the removal of the culvert. The trial court held for respondents. We affirm.

## FACTS

Sometime before 1900, Burlington Northern, Inc., built railroad tracks along the northern border of Fanny and Nesbit Townships. On the south side of the railroad tracks it constructed the ditch at issue (the "railroad ditch"). On the north side of the railroad tracks is County Ditch 126. Burlington Northern also built trestles or "equalization bridges" to allow water to drain north from the railroad ditch into County Ditch 126, which eventually empties into the Grand Marais coulee. Burlington Northern stopped using the railroad tracks approximately ten years ago.

Appellants and the Driscoll Brothers farm adjacent tracts of land south of the railroad ditch; the Driscolls' land is west of appellants' land. Water drains off appellants' lands into the railroad ditch and flows west. By the time the water in the railroad ditch reaches the Driscoll Brothers, it overflows and floods their lands.

The parties' lands flood each spring, and occasionally in the summer. Appellant Howard Rutherford remembered three or four summer floods. The most recent summer flood was in June, 1984, and caused extensive damage to the parties' crops. In that flood, Rutherford lost 4 or 5 acres of his sugar beet crop, about 10% of the total crop. Appellant Roger Love lost 75% of his sugar beet crop. The Driscoll Brothers lost two-thirds of their potato crop despite their use of pumps to drain their land.

Appellants claim that County Ditch 126 provides inadequate drainage when their lands flood because the county ditch runs full longer than the railroad ditch does. For example, appellant Allan Love testified that when flooding occurs the railroad ditch takes about four days to clear and the county ditch takes eight to ten days. The Watershed District's engineer confirmed that the county ditch is "inadequate by about 50%."

According to the Driscoll Brothers, their flooding problems result from appellants having improved the drainage in the railroad ditch beyond what it was meant to handle. During the June, 1984, flood, they placed canvas covers over two 36-inch culverts that were in the railroad ditch, to slow the flow of water coming into their land from Roger Love's field. After several hours, they removed the covers at Roger Love's request.

In May, 1986, the Driscoll Brothers installed a dike with an 18-inch culvert in the railroad ditch to restrict the flow of water onto their land. After Roger Love contacted the Watershed District, its engineer, Charles Anderson, met with some of the appellants, investigated the site and told them the Driscolls needed a permit for the culvert. Roger Love then removed the 18-inch culvert.

On May 19, 1986, the Driscoll Brothers applied for a permit to install a 24-inch culvert in the railroad ditch to "prevent flooding by controlling amount of water from newly constructed ditch east of culvert." After receiving the application, Anderson inspected the railroad ditch from end to end. On May 29, 1986, he sent the Watershed District's Board of Managers his findings and recommended that the application be placed on the agenda for the next board meeting.

The Watershed District ordinarily issues permits without their being discussed at board meetings, if the engineer and the manager for the area in question recommend approval, and there is no objection. Anderson testified that over the past ten years the Watershed District has granted approximately 500 permits for installing culverts. The Driscoll Brothers' application was put on the agenda so that all seven managers could take part in the decision, and to allow the affected landowners to be heard.

The application was discussed at a board meeting on June 12, 1986. Appellants were not given formal notice of the board meeting, but Anderson told Roger Love

about it and they all attended. Although it was not a formal hearing with sworn testimony and a record, appellants were given the opportunity to speak. The board deferred a decision on the application until its next meeting on June 26, 1986.

Appellants were again given the opportunity to speak at the second board meeting. After recessing to visit the site, the six present board members unanimously approved the application.

Although the Driscoll Brothers' application requested permission for a culvert only, they installed a culvert surrounded by a dike. Anderson testified their work conforms with the permit.

Appellants appealed to the district court from the Watershed District's order granting the permit and sued for an injunction directing rescission of the permit and removal of the culvert. Both proceedings were consolidated for trial.

The trial court held for respondents and denied appellants an injunction. It also denied appellants' motion for amended and additional findings. This appeal is from the order for judgment and the order denying amended and additional findings.

## ISSUES

1. Did the Watershed District have authority to grant the permit for the culvert?

2. Was the Watershed District's granting of the permit an unconstitutional taking of appellants' property for public use?

## ANALYSIS

### I.

We initially note that while both orders are appealable under Minn.R.Civ.App.P. 103.03(b), which allows appeals from orders refusing injunctions, this appeal is untimely as to the order for judgment because it was filed more than 30 days after service of written notice of filing. See Minn.R.Civ. App.P. 104.01. The appeal from the order denying amended and additional findings is timely, however, and we will review the order for judgment as well because it af-

fects the other order. See Minn.R.Civ.App. 103.04.

### II.

The Driscoll Brothers applied for the permit pursuant to rules promulgated by the Watershed District under the Minnesota Watershed Act, Minn.Stat. § 112.43, subd. 1(17) (1986). Appellants argue the Watershed District lacked authority to grant the permit because § 112.48 of the Watershed Act requires that a "project" be instituted only by filing a petition, and the installation of the culvert was a "project" as defined by § 112.35, subd. 19. Approving a petition for a project requires much more formal proceedings than does the issuance of a permit. See Minn.Stat. §§ 112.48–.60.

Even assuming the installation of the culvert was a project, however, § 112.48 does not require that projects be approved only upon petition. The statute states: "[A] petition *may* be filed with the managers for any project * * *." Minn.Stat. § 112.48, subd. 1 (1986) (emphasis added).

Minn.Stat. § 112.47 (1986) also indicates that not all projects require a petition:

> All projects of the district *which are to be paid by assessment upon the benefited properties*, shall be instituted: (1) by a petition filed with the managers; (2) by unanimous resolution of the managers; or (3) as otherwise prescribed by this chapter.

(Emphasis added.)

The Watershed Act recognizes that the Watershed District can authorize certain types of work by issuing a permit rather than through the petition process. See § 112.88, subd. 1 (1986). Nothing in the Watershed Act suggests it was inappropriate for the Watershed District to authorize the installation of the culvert by granting a permit rather than by requiring the Driscoll Brothers to file a petition.

### III.

Appellants argue they have a prescriptive easement in the use of the railroad ditch for drainage, and that the Watershed

District's granting of the permit constitutes a taking under the state constitution. The Driscolls argue that appellants have not shown they meet the requirements for a prescriptive easement. We agree they have not, because there is no evidence suggesting their use was "hostile." *See, e.g., Naporra v. Weckwerth,* 178 Minn. 203, 205–06, 226 N.W. 569, 571 (1929); *McCuen v. McCarvel,* 263 N.W.2d 64, 66 (Minn. 1978). This is not dispositive, however, because there could be a taking of appellants' farmland by flooding even if they have no easement. *See, e.g., Spaeth v. City of Plymouth,* 344 N.W.2d 815 (Minn. 1984).

■ The trial court concluded that even if appellants have acquired an easement, the question of whether placement of the culvert will constitute a taking is at this point speculative. We agree.

Appellants rely on three cases for their argument that the Watershed District's granting of the permit constitutes a taking: *Nelson v. Wilson,* 239 Minn. 164, 58 N.W.2d 330 (1953); *Spaeth;* and *Caponi v. Carlson,* 392 N.W.2d 591 (Minn.Ct.App. 1986), *pet. for rev. denied,* (Minn. Oct. 29, 1986).

In *Nelson,* the State built two dams which caused flooding in surrounding lands due in part to the overflowing of a drainage pool behind one dam. The supreme court held there had been a taking of lands below the dams which had been periodically flooded when the pool was drained, and had remained wet and flooded for several years. It stated:

> Whether occasional flooding is of such frequency, regularity, and permanency as to constitute a *taking* and not merely a temporary invasion for which the landowner should be left only to a possible recovery of damages is a question of degree, and each case must stand on its own peculiar facts.
>
> *    *    *    *    *    *
>
> Here, since the land remained flooded and wet for several years, since a bridge and trees were swept away, and since the state had full knowledge of the flooding and had taken no timely steps to

correct the situation, * * * there is ample evidence to support the finding of a taking * * *.

239 Minn. at 172, 58 N.W.2d at 335 (emphasis in original).

In *Spaeth,* the city designated part of plaintiff's land as a storm water holding pond. As a result, land which had only contained surface water during spring and drained dry by June was "continually occupied" by standing water. 344 N.W.2d. at 820. The supreme court held this constituted a taking. It rejected the city's argument that there had been no "permanent flooding" as defined by *Nelson:*

> [T]he evidence shows more than occasional water accumulation; rather, a portion of [plaintiff's] property has generally remained flooded for approximately three years.

*Id.* at 822.

In *Caponi,* this court similarly held that a city's use of plaintiff's land as a storm water holding pond constituted a taking:

> Caponi's land, which was intermittently wet and dry, is now permanently flooded; it was sometimes tillable and suitable for grazing cattle. He fenced the land. This fence is now under water. * * * He has no use of the property.

392 N.W.2d at 596.

Appellants argue that as a result of the culvert, their land will be flooded each spring for a substantially longer period than in the past, preventing them from planting their crops on time, and there will be increased crop damage during the occasional summer flood. The record shows that there is intermittent flooding of appellants' lands, and the installation of the culvert will likely exacerbate the flooding. It does not establish, however, that the intermittent flooding will be of sufficient "frequency, regularity, and permanency" to constitute a taking under *Nelson,* 239 Minn. at 172, 58 N.W.2d at 335.

## DECISION

The trial court's decision that appellants were not entitled to an injunction directing

rescission of the permit and removal of the culvert is supported by the evidence.

Affirmed.