Kathy Ruth ANGELL, Respondent,

v.

HENNEPIN COUNTY REGIONAL RAIL
AUTHORITY, petitioner Appellant.

No. C6–97–75.

Supreme Court of Minnesota.

May 7, 1998.

Peter A. Koller, Moss & Barnett, Minneapolis, for appellant.

John M. Steele, Minneapolis, for respondent.

## OPINION

GILBERT, Justice.

This is an appeal from a decision of the court of appeals reversing a summary judgment order in favor of appellant, Hennepin County Regional Rail Authority. Respondent, Kathy Ruth Angell, was seriously injured while riding her bike on property owned by the Authority. Angell sued the Authority,[1] and the Authority moved for summary judgment, asserting statutory immunity under Minn.Stat. § 466.03, subd. 6 (1996), and unimproved property immunity under Minn.Stat. § 466.03, subd. 13 (1996). The district court held that statutory immunity applied in this case, and having determined that was sufficient to grant summary judgment, the district court declined to rule on whether the Authority was immune based on unimproved property immunity. The court of appeals reversed, concluding that

neither theory of immunity applied in this case. We affirm the decision of the court of appeals.

On the afternoon of July 16, 1995, respondent, Kathy Ruth Angell, and her friend, Michael McGowan, rode their mountain bikes from their home in southwest Minneapolis to a restaurant in downtown Minneapolis. To get into downtown, Angell and McGowan rode their bikes on various public bike trails around Lake Harriet, Lake Calhoun, and Cedar Lake. After spending the afternoon downtown, they began their bike ride home as dusk was approaching. On their way home, as they approached Cedar Lake, Angell veered off the paved public trail and onto a dirt path to take what she believed would be a short-cut. The dirt path ran along the east side of Cedar Lake. The path appeared to be well-traveled and as Angell rode onto it, another rider was just coming off. Angell was seriously injured when she biked off the loading dock which was located at the end of the dirt path. She fell four feet, and her face struck the concrete slab on the ground. There were no access restrictions or warning devices near the loading dock.

Angell's accident occurred on land owned by the Authority. The Authority was established in 1980 under Minn.Stat. ch. 398A (1996). Chapter 398A contains enabling legislation permitting counties, cities, and towns to establish regional railroad authorities. The purpose of such railroad authorities is "to provide for the preservation and improvement of local rail service for agriculture, industry, or passenger traffic and to provide for the preservation of abandoned rail right-of-way for future transportation uses." Minn.Stat. § 398A.02 (1996). The Authority's initial responsibility was to implement a light rail transit system (LRT) in Minneapolis. To accomplish this, it purchased various pieces of property in and around Minneapolis. At the time of Angell's accident, the Authority owned and managed several properties in Hennepin County and Carver County that it was holding for future use in transportation projects. In all, these properties

---

1. Angell also named Hennepin County, the City of Minneapolis, and the Minneapolis City Parks and Recreation Board as defendants. The district court granted summary judgment to those defendants, and they are not involved in this appeal.

consisted of approximately 41 miles of railroad corridors and eight other properties totalling 46 acres. The Authority generated revenues as a landlord from leasing some of its property.

The Authority acquired the property on which the accident occurred, which it refers to as the Hopkins to Minneapolis corridor (Hopkins corridor), in 1984 as part of a potential linkage for the LRT between some of the southwestern suburbs and Minneapolis. The previous owner of the Hopkins corridor was Chicago and Northwestern Railroad Company. At the time the Authority purchased the Hopkins corridor, the loading dock was on the property as well as the remains of old railroad tracks and structures. The Authority had several of the structures demolished and removed, including a structure near the loading dock. The Authority also removed debris left from illegal dumping. The Authority claims that it posted "No Trespassing" signs on roads crossing the Hopkins corridor but that vandals have often removed them. On the day of the accident, neither Angell or McGowan saw any "No Trespassing" signs nor is there anything in the record to show that signs were posted around the loading dock.

By 1995, the Hopkins corridor was no longer considered part of the proposed LRT, and the Authority suggested that it might be opened for bike and trail use. The Authority considered leasing it to the Minneapolis Park and Recreation Board as part of the park and recreation and trail systems, but that plan never materialized. There is, however, a paved trail that runs along part of Cedar Lake and is adjacent to the Hopkins corridor. The area where the Hopkins corridor and the paved trail meet was an open area and there were no signs or other markings distinguishing the two properties.

Both Angell and McGowan gave uncontradicted testimony that the area in which Angell was injured was commonly used by joggers and bicyclists and appeared to be open to the public. Immediately after Angell fell off the loading dock, while McGowan administered first aid to Angell, at least three other bicyclists happened by within 15 minutes of each other. McGowan testified "that [the] area is literally crisscrossed with bike trails." In fact, the trail that he and Angell were riding on was paved with artificial surfaces in some parts, including the portion leading up to the four-foot drop-off of the loading dock.

In February 1995, approximately five months before Angell's accident, the Authority developed and officially adopted a Land Use Management Plan, which applied to all of its property, including the Hopkins corridor. The plan gives background information about the Authority's property and addresses property management issues. Specifically, the plan establishes recommendations and guidelines for Authority staff to use in evaluating and making decisions regarding maintenance, access, use and sale of Authority's properties. The recommendations are intended to preserve property for future LRT use, provide for interim uses, maintain cooperative relationships with affected property owners, provide for maximum return on the Authority's investment, and protect the environment.

### I.

■ The Authority asserts that it is immune from liability for Angell's accident. The Authority is a local governmental unit and a political subdivision of the state. Minn.Stat. § 398A.04, subd. 1 (Supp.1997). As a regional railroad authority, the Authority has tort liability to the extent a municipality would be liable under Minn.Stat. §§ 466.01 to 466.15 (1996). Minn.Stat. § 466.01, subd. 1 (Supp.1997); Minn.Stat. § 398A.04, subd. 6(a) (1996). While municipalities are generally liable for their torts, the legislature has provided for limited exceptions of immunity. *See* Minn.Stat. §§ 466.02, 466.03. One such exception applies when the municipality's alleged tortious conduct constitutes a discretionary function, whether or not that discretion was abused. Minn.Stat. § 466.03, subd. 6. This type of immunity, called "statutory immunity,"[2] protects policy-making, or dis-

---

**2.** Minnesota Statutes section 466.03, subd. 6 provides that municipalities are not liable for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function

cretionary activities that are legislative or executive in nature. *Johnson v. State,* 553 N.W.2d 40, 46 (Minn.1996).

Determining whether statutory immunity applies requires a careful examination of the challenged governmental activity. *Nusbaum v. County of Blue Earth,* 422 N.W.2d 713, 719 (Minn.1988). The analysis may involve some difficulty because "almost every act involves some measure of discretion, and yet undoubtedly not every act of government is entitled to [statutory] immunity." *Cairl v. State,* 323 N.W.2d 20, 23 (Minn. 1982). This court has consistently interpreted the statutory immunity narrowly. *See, e.g., Zank v. Larson,* 552 N.W.2d 719, 721 (Minn.1996); *Holmquist v. State,* 425 N.W.2d 230, 231 (Minn.1988).

The rationale underlying statutory immunity is that the judicial branch of government should not second guess the policy-making activities of other branches of government, thereby disrupting separation of powers. *Nusbaum,* 422 N.W.2d at 718. Statutory immunity applies only when the challenged government activity originated from a balancing of political, social and economic factors. *See id.* at 722; *Zank,* 552 N.W.2d at 721. In contrast, operational or day-to-day decisions involving the application of scientific or technical skills are not protected by statutory immunity. *Nusbaum,* 422 N.W.2d at 722.

Merely labeling an activity as policy-based or operational, however, is insufficient. Courts must focus on the nature of the government decision, "applying the exception only where the decision involved a balancing of policy objectives rather than merely a professional or scientific judgment." *Id.* at 719–20. Implementing a policy, in contrast to formulating the policy itself, is often not subject to statutory immunity. *Holmquist,* 425 N.W.2d at 234.

The first step in our analysis of the Authority's statutory immunity claim is to identify the conduct at issue. *Steinke v. City of Andover,* 525 N.W.2d 173, 175 (Minn.1994). Angell claims that the Authority was negligent in failing to (1) maintain its property; (2) place warning signs around the loading dock; and (3) install a barricade in front of the loading dock. The issue is whether this conduct was the result of a discretionary function and thus is immune, or an operational function not entitled to immunity. We begin our review with the Authority's established plan.

At oral argument, counsel for the Authority conceded that the plan, which had been officially adopted by the Authority, contains a policy of limiting access to its properties. The adoption of this plan was a planning-level decision that statutory immunity was intended to protect. In its brief to this court urging immunity, the Authority focuses essentially on its "policy decision" not to open up the property at issue to the public or to remove the loading dock. The district court based its grant of summary judgment on what it termed the discretionary nature of the Authority's decision not to remove the loading dock. The court of appeals reversed the district court and held that the Authority failed to meet its burden of proving that the decision to leave the land idle and closed to the public resulted from a planning-level decision. However, under our analysis, the inquiry must begin with the Authority's broad policy decision to restrict access to all of its properties.

The Authority's plan addresses access to properties, stating that the linear rail corridors afford relatively easy access and that "[w]ith access comes liability." Consequently, the plan recommends use of various types of access restrictions, such as fencing, tree planting, and signs, "to remedy a security or liability risk." The plan outlines recommendations for limiting access to its properties and instructs that Authority staff should use them as guidelines to make specific decisions about restrictions on its various properties.

or duty, whether or not the discretion is abused." We refer to immunity under this provision as "statutory immunity," although earlier cases sometimes refer to it as "discretionary immunity." *See Watson by Hanson v. Metropolitan Transit Comm'n,* 553 N.W.2d 406, 409 n. 1 (Minn. 1996); *Janklow v. Minnesota Bd. of Exam'rs for Nursing Home Adm'rs,* 552 N.W.2d 711, 716 (Minn.1996).

"No Trespass" signs were to be posted in locations where liability exposure was deemed particularly high. One recommendation regarding access specifically provides that "[a]ppropriate access restrictions will be installed in such cases where it is determined that such restriction will protect users of the property." Both parties acknowledge that by virtue of the plan, the Authority had established a clear policy of limiting access to its linear rail corridors. We agree.

The question then becomes whether Authority staff engaged in operational activities and merely exercised scientific or professional judgment in day-to-day functions when they failed to restrict access to the Hopkins corridor and failed to block off the loading dock or to warn of its presence; or, whether those activities were policy-making in nature. The distinction between policy-making activities and operational activities may involve "gray areas, [but] the underlying consideration is 'whether the conduct involves the balancing of public policy considerations in the formulation of policy.'" *Pletan v. Gaines*, 494 N.W.2d 38, 43–44 (Minn.1992) (quoting *Holmquist*, 425 N.W.2d at 232).

In this case, the record is completely devoid of any evidence establishing that the failure to install access restrictions was based on policy decisions involving economic, political, and social factors. The Authority did submit the affidavit of Kenneth Stevens, the manager of the transit and real estate division of the Authority. In his affidavit, Stevens asserts that the Authority's decisions regarding present and future use, operation and management of its properties are made based on a number of "policy objectives and concerns." Stevens then elaborates on what these policy considerations are and how they affect the Authority's decisions regarding interim and ultimate uses of the land. However, at no point in his affidavit does Stevens address decisions regarding restricting access to its properties. *See Holmquist*, 425 N.W.2d at 234 (underscoring that the state did not show that failure to place a warning sign at a particular location was the result of

a policy-making decision subject to statutory immunity); *Nusbaum*, 422 N.W.2d at 722 n. 6 (stating that the burden is on the state to prove that it has statutory immunity); *Steinke*, 525 N.W.2d at 175 (stating statutory immunity protects the government only when it can produce evidence its conduct was of a policy-making nature). Authority staff had the responsibility to make professional judgments regarding where and how to implement the policy of restricting access to the Authority's properties based on the plan's recommendations. These judgments are not the type of government activity that the legislature intended to immunize.

Nevertheless, the Authority presents this court's decision in *Steinke v. City of Andover* in support of its position. In *Steinke*, a snowmobile driver was injured when his snowmobile struck the bank of a county drainage ditch. 525 N.W.2d at 174. The snowmobile driver was driving more than 45 miles per hour, when he drove into the far bank of the ditch. *Id.* The driver was not on a designated trail and admitted he was trespassing. *Id.*

■ The driver sued Anoka County, asserting that it was negligent in failing to warn about the presence of the ditch.[3] *Id.* We determined that the County was entitled to statutory immunity for its policy decision to place "deep ditch" signs only at private and public ditches along county roads and recognized right-of-ways rather than at all drainage ditches. *Id.* at 176. We explained that the decision involved the type of political, social and economic considerations that lie at the center of actions protected by statutory immunity. *Id.* The critical distinction, however, between *Steinke* and this case is that in *Steinke* the lack of signs and barriers at the ditch was not merely the result of professional judgments by staff in the implementation of an established policy. Rather, those decisions regarding the lack of signs were made at the policy-making level in the first instance. Conversely, in this case, Authority staff members were only using its professional judgment in implementing its

---

**3.** The plaintiff also sued the City of Andover and we held that Andover was immune under Minn. Stat. § 466.03, subd. 6(e), which provides immu-nity to municipalities in parks and recreation areas under certain circumstances.

policy regarding access restriction. When the government implements established policy it is generally not immune from liability. *Steinke,* 525 N.W.2d at 175; *Holmquist,* 425 N.W.2d at 233 ("implementation [of] * * * established policy to a particular fact situation * * * is unprotected operational level conduct—albeit conduct which calls for the special knowledge and expertise of government employees and requires the exercise of professional judgment").

In conclusion, we hold that the Authority is not entitled to statutory immunity under Minn.Stat. § 466.03, subd. 6 for its failure to restrict access, post warning signs or erect a barricade at this location. The Authority has not shown that the relevant decisions involved anything more than technical and professional evaluations.

## II.

 In the alternative, the Authority argues that it is immune from liability under the unimproved property exception to municipal tort liability which provides:

> Any claim for a loss caused by the condition of unimproved real property owned by a municipality, which means land that the municipality has not improved, land that is owned or administered by the municipality that contains idled or abandoned mine pits or shafts, and appurtenances, fixtures, and attachments to land that the municipality has neither affixed nor improved.

Minn.Stat. § 466.03, subd. 13 (1996).

We find no merit to the Authority's contention that the property at issue was not improved. The property had been partially improved at the time the Authority purchased the property. It consisted largely of an old railroad switching yard and contained various railroad structures, including buildings, roads and old railroad beds and the loading dock. After the Authority acquired the property, it demolished and removed certain railroad structures. Angell contends that one of these demolished buildings or structures had been attached to the loading dock. Angell submitted the affidavit of John Darkenwald, a licensed realtor for nearly 30 years. Darkenwald stated that the loading dock was:

part of a foundation on which stood a building of some type that was used by the former owner, the railroad. * * * [T]he structure was removed but the loading dock was not. * * * [I]n clearing the land of useless structures and track the [Authority] bettered the land, made it more valuable for any kind of development and helped increase its value.

The Authority, however, maintains that the loading dock was "a substantial 'stand-alone' structure located immediately adjacent to a stretch of railroad tracks." However, the record does show that the Authority removed a structure or building that was, at the very least, near the loading dock. Under these facts, we hold that the property on which Angell was injured was not "unimproved property" as contemplated by Minn.Stat. § 466.03, subd. 13 and, therefore, the Authority cannot avoid liability based on unimproved property immunity.

Affirmed and remanded.