*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1255**

Shane Feldhaus, et al.,
Appellants,

vs.

City of Minnetonka,
Respondent.

**Filed May 6, 2024
Affirmed in part, reversed in part, and remanded
Bratvold, Judge**

Hennepin County District Court
File No. 27-CV-22-2807

Jeffrey W. Coleman, Lars C. Erickson, Coleman & Erickson, LLC, Eden Prairie,
Minnesota; and

Benjamin J. Kirk, Rossman Attorney Group, PLLC, Edina, Minnesota (for appellants)

Elisa M. Hatlevig, Trevor S. Johnson, Jardine, Logan & O'Brien, PLLP, Lake Elmo,
Minnesota (for respondent)

Considered and decided by Smith, Tracy M., Presiding Judge; Bratvold, Judge; and

Jesson, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

**BRATVOLD**, Judge

In this appeal from summary judgment, appellants challenge the dismissal of their claims stemming from the intermittent flooding of their residential property by a nearby pond. The City of Minnetonka (city) owns and maintains the pond as a part of its stormwater-management system. Appellants assert that the flooding amounts to a physical taking that requires just compensation. Alternatively, appellants contend that the city is liable in nuisance or trespass for damage caused by its failure to manage pond water levels by routine maintenance and its approval of development within the watershed that increased impervious areas.

Appellants argue that the district court erred by (1) determining that no taking occurred, entering judgment for the city as a matter of law on their eminent-domain and inverse-condemnation claims, and dismissing their statutory claim for attorney fees and costs, and (2) determining that the city is not liable, in the alternative, for appellants' tort claims because the challenged government conduct is shielded by discretionary--function immunity under Minn. Stat. § 466.03, subd. 6 (2022).

Based on our review of the summary-judgment record, we conclude that the district court erred in granting summary judgment on the eminent-domain and inverse-condemnation claims. As a result, it is also not proper to dismiss appellants' statutory claim for attorney fees and costs. As for appellants' alternative tort claims, we conclude that the city has satisfied its burden to show that its decisions to forgo routine maintenance of the pond and not to install an outlet in the pond are protected by

discretionary-function immunity because this challenged conduct involves economic, political, and planning decisions. On the other hand, appellants also challenge the city's development decisions that, they claim, increased impervious surfaces around the pond and increased flooding. Based on the record before us, we conclude that the city has failed to offer evidence showing that the city's development decisions are protected discretionary functions. Thus, we affirm in part, reverse in part, and remand.

**FACTS**

The following summarizes the evidence received on summary judgment and stated favorably to the nonmoving parties. Appellants Shane and Sara Feldhaus own a single-family home on a lot in the city (the property). Huntingdon Pond (the pond) lies adjacent to the property and is surrounded by single-family homes. It is undisputed that the city owns the landlocked pond, which has no outlet or overflow mechanism. The city included the pond in its stormwater-management plan, and the public-works department acknowledges that it is responsible for pond maintenance. The city's director of public works testified that the department does not "have a routine maintenance schedule" for the pond but does "perform reactionary maintenance."

*Water Resource-Management Plans*

The city's stormwater-management plan includes many ponds and wetlands in the city. Under Minn. Stat. § 103B.235 (2022) and Minn. R. 8410.0010-.0180 (2023), cities must implement local water-management plans. The city adopted four Water Resource Management Plans (WRMPs) in 1982, 1999, 2010, and 2019, respectively.

3

The city's 1982 WRMP stated that the city has over 900 ponds and identified Huntingdon Pond as "pond 501." The 1982 WRMP recognized that 86 ponds posed a risk of flooding to nearby homes and that 35 had a "high" flood-damage potential, one of which was pond 501. It stated that pond 501 "does not have an outlet" and that "[i]t appears that flood damage could occur to homes located around this pond for events more frequent than the 100-year events." The 1982 WRMP also acknowledged that new development impacts stormwater runoff, pointing out that the "increase in the stormwater runoff caused by the construction of a house, garage, and driveway, on a typical urban lot, is normally rather small. When this increase is repeated by the construction of numerous homes, driveways, and garages, however, the effects become significant."[1]

The 1982 WRMP included information about installing an outlet for the watershed along with some design details, as did the 1999, 2010, and 2019 WRMPs. Three of the WRMPs stated that the "city will consider the installation of outlets in all of [the landlocked] wetlands to reduce the existing storm bounce and inundation periods."

The 2010 WRMP stated that the city "will require development to apply best management practices to reduce the volume of stormwater runoff, to the maximum practical extent. Examples of stormwater runoff volume reduct[ion] methods include . . . reducing the amount of planned impervious surface as areas develop." The 2010 and 2019 WRMPs stated that the city "will correct existing flooding problems," for

---

[1] No similar comment about increased development is found in the 1999, 2010, or 2019 WRMPs. We observe that the 1999 WRMP notes that the city is "nearly fully developed" with only 4% of land still developable.

example, "by upgrading the storm drainage system, flood protection, or acquisition of the property. The city will develop and follow operation and maintenance plans to minimize flooding potential around landlocked areas."[2]

The 2019 WRMP adopted goals, as did the predecessor WRMPs. Some of these goals are relevant to this litigation, including "decreas[ing] stormwater runoff," "manag[ing] the rate and volume of runoff," "protect[ing] the public," "protect[ing], preserv[ing], and us[ing] that natural surface and groundwater storage and retention systems," and "minimiz[ing] public capital expenditures needed to correct flooding and water quality problems."

*Flooding of the Property*

The pond has flooded the property three times since appellants moved there in 2007. In 2014, the flood submerged the appellants' patio. Appellants do not recall how long the patio remained flooded. City employees used temporary pumps and placed sandbags to protect the property. The pond flooded again in 2017, submerging the appellant's patio and damaging the lawn-irrigation system. Appellants contacted the city about the 2017 flooding, but the city did not pump the pond or place sandbags. Appellants did not offer evidence showing how long the patio was flooded but acknowledged that the water levels later receded to normal levels.

---

[2] While the 2010 WRMP stated that "flooding problems" would be corrected "within available funding constraints," the 2019 WRMP removed the "funding constraints" language.

After the 2017 flood, two city employees from the public-works department visited the property, met with appellants, and placed a marker at the edge of pond to help measure changes in water level.

On December 7, 2017, the city's water-resources engineering coordinator (city water engineer) emailed appellants, stating that the city was providing "background on Huntingdon Pond." The email stated that "no significant land-use change[s]" in "this drainage area" had occurred over "the last 40 years," recent flooding resulted from "increased frequency and severity of precipitation events," and the city would pump the pond only when there was a "threat of structural damage." The email stated that "installation of an outlet" to regulate the pond "is currently unscheduled and unfunded." While appellants could "submit a petition for installation of an outlet," the email advised that if a petition "were to be submitted, following my review and information above, I would not recommend the council move forward with the project." The email explained that "[t]his is due to the limited public benefit (only benefits one home) and the extremely high cost of an outlet in this area" because "complete reconstruction" of nearby streets is required "to place the infrastructure and move stormwater downstream." The email concluded by suggesting that appellants construct "a small berm" to "provide additional flood resiliency to [their] home."

The pond flooded for a third time in 2019. This time, appellants' backyard and deck posts were completely submerged. The city pumped the pond and placed sandbags. Consistent with the city water engineer's 2017 email to appellants, deposition testimony from the director of public works explained that the city does not have a "standard policy"

6

for how and when a pond is pumped. Instead, the public-works department uses its "engineering judgment and discretion" based on many factors, such as "how much the [water] levels had changed," precipitation, downstream conditions, and public input. The city water engineer offered similar testimony about pumping during pond flooding.

*The City's Decision Not to Install an Outlet and Ongoing Flood Risk*

In 2020, the city held a "neighborhood meeting" to discuss installing "a potential outlet" to reduce flooding of the pond. The city's presentation suggested that, since the 1990s, the city's goals have included installing an outlet in the pond to control water levels. The city estimated the cost of an outlet was $1 million to $1.2 million and noted that installation requires a permit from the Minnesota Department of Natural Resources. Residents at the meeting were divided; some supported and some opposed installing an outlet in the pond.

About one month later, the city decided that it would not install an outlet in the pond based on several factors, including "cost, property structure[,] flooding potential including number of properties impacted, history of high water in areas, stormwater projects that could be combined with reconstruction projects, water quality improvement, and the ongoing maintenance of the city's existing aging infrastructure."

In 2021, the city commissioned a "Landlocked Basin Sensitivity Analysis" on the pond as well as many others. The analysis showed that almost 50 structures around the

city's landlocked ponds were at risk of flooding during a 1% critical storm event.[3] The study determined that in two out of three scenarios, the pond elevation would exceed the elevation of the lower level of appellants' property. As summarized in the city's brief filed with this court, the 2021 analysis "confirmed that at least 47 structures, including appellants' home, would be at risk of flooding under certain precipitation conditions."

*This Litigation*

Appellants sued the city in April 2021 and alleged five claims: (1) inverse condemnation, (2) eminent domain, (3) attorney fees under Minn. Stat. § 117.045 (2022), (4) nuisance, and (5) trespass. The city answered and denied liability.

After discovery closed, the city moved for summary judgment. In opposition to summary judgment, appellants filed a memorandum and evidence, including a report by their expert discussing how increased development in the pond watershed reduced stormwater-storage capacity and increased pond flooding.[4]

Appellants' expert report first examined the city's WRMPs and concluded that the city "was aware" that the pond "had a potential flooding problem, and that flood damage could occur" at appellants' property. Next, the report reviewed the city's landlocked-basin-sensitivity analysis and determined that, "in all three scenarios,"

---

[3] A 1% critical storm event is peak flooding about every 100 years, meaning it has a 1% chance of occurring each year.

[4] Appellants also offered evidence that their property value had decreased. They filed a letter from a real-estate agent stating that appellants' property had "diminished value in a sale based on flooding history and risk." In the agent's opinion, the home's sale value had lowered by at least $300,000. Although an appraisal of the property was discussed at the summary-judgment hearing, no appraisal was filed.

appellants' property "floods or nearly floods using reasonable starting water elevations before a critical 1% storm event." Third, the report identified the city's approval of many developments and improvements within the pond watershed, such as houses, decks, garages, and other structures, that increased impervious areas within the watershed. The report also discussed the city's approval of the "construction of a new home" in 1993, which included filling in a "natural depression" near the pond and "resulted in a decrease" in the pond's stormwater-storage capacity. Finally, the report concluded that the city had not "controlled/managed all storm sewer inlets" at the pond and that, together with increases in impervious areas, this "contributed to an increased probability" of appellants' property flooding, which the report described as "a permanent risk . . . that has increased over time."

Among other submissions the city filed in support of its motion was a deposition of the director of public works explaining that the city reviews proposed new structures for compliance with rules, regulations, and ordinances, while the city's planning department handles permitting for new structures and generally makes recommendations about ordinances. The city stated in response to appellants' interrogatory that "there is a city ordinance relative to the amount of hardscape or impermeable surfaces allowed but this has changed over time"; other evidence suggested that the city had not adopted a limit on impervious surfaces or "hardcover." When asked about this, the director of public works testified, "I can't speak to that on behalf of planning." He added that any hardcover limit was a decision for the city council and that the planning department would make recommendations and consult the public-works and natural-resources departments.

As for the review of specific new construction, the director of public works explained: "[I]f a home were being built, we would look at the current regulations as a city and see what those are, how the water would need to be controlled, part of our stormwater management plan, which is rate and volume. So we would look at each individual situation." In doing this review, public works considers "a number of different factors" and uses its "background and training and education." As for permit approval, the director of public works "can't speak to all those" because the "planning department generally covers that."

Following a hearing, the district court issued an order granting the city's summary-judgment motion. The district court first determined that no constitutional taking occurred reasoning that flooding of appellants' property was "infrequent and insubstantial" and did not "substantial[ly] interfere with the use and enjoyment of the property." On the related inverse-condemnation claim, the district court determined that there was no evidence that the city failed to exercise a duty imposed by law or that appellants experienced a public wrong particularly injurious to them. The district court reasoned that the city had "no legal duty to maintain the water levels of the pond." The district court also rejected appellants' claim for attorney fees under Minn. Stat. § 117.045, the inverse-condemnation statute.

The district court separately concluded that the city was immune from liability for appellants' tort claims based on its statutory immunity for discretionary functions under Minn. Stat. § 466.03, subd. 6. The district court determined that the conduct at issue was "the city's decision not to install" a permanent outlet to regulate the pond's water level.

10

The district court also determined that the city's decision "is discretionary[,] and that a policy as to how and when to install an outlet absolutely exists." Thus, the district court granted summary judgment for the city on all claims.

This appeal follows.

**DECISION**

Appellate courts "review the grant of summary judgment de novo." *Montemayor v. Sebright Prods., Inc.*, 898 N.W.2d 623, 628 (Minn. 2017). District courts must grant summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgement as a matter of law." Minn. R. Civ. P. 56.01. "We view the evidence in the light most favorable to the party against whom summary judgment was granted . . . ." *Com. Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015). "Similarly, all factual inferences must be drawn against the movant for summary judgment." *Senogles ex rel. Kihega v. Carlson*, 902 N.W.2d 38, 42 (Minn. 2017) (quotation omitted). "In an appeal from summary judgment, we must determine whether there are genuine issues of material fact and whether the district court erred in applying the law." *Vassallo by Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014).

Appellants contend that the district court erred by granting summary judgment. First, appellants argue that whether a constitutional taking occurred is the central issue for both inverse-condemnation (count I) and eminent-domain (count II) claims. Appellants argue that these claims survive summary judgment because the city "de facto appropriated" appellants' property "to fulfill the pond's stormwater holding function," which "the city

has no right to do" without "legal compensation." Relatedly, appellants ask this court to restore their request for statutory attorney fees for their inverse-condemnation claim (count III). Alternatively, appellants argue that, if a constitutional taking did not occur,the city is liable for damage to their property under the common law for nuisance (count IV) and trespass (count V) because the city's conduct is not immune as a discretionary function under Minn. Stat. § 466.03, subd. 6. We consider these arguments in turn.

## I. The city is not entitled to summary judgment on the eminent-domain and inverse-condemnation claims or on appellants' related claim for attorney fees.

Appellants' brief to this court identifies three issues, one for each of the first three counts in its complaint: inverse condemnation, taking or eminent domain, and statutory attorney fees under Minn. Stat. § 117.045.[5] These three issues are related, first, by whether a constitutional taking has occurred. "A district court reviewing a petition for a writ of mandamus must decide whether a taking of property has occurred in the constitutional sense." *Nolan & Nolan v. City of Eagan*, 673 N.W.2d 487, 492 (Minn. App. 2004), *rev. denied* (Minn. Mar. 16, 2004). Similarly, a complaint alleging that the government has exercised its eminent-domain powers requires a district court to determine whether property has been taken in violation of the constitution. *See, e.g.*, *Spaeth v. City of Plymouth*, 344 N.W.2d 815, 820, 822 (Minn. 1984) (determining that a constitutional taking had occurred and therefore that the district court properly issued "a writ of mandamus compelling the City to commence eminent domain proceedings"). And a

---

[5] We note that we have somewhat revised appellants' organization of the issues for this opinion.

request for attorney fees under Minn. Stat. § 117.045 is based on a successful "action compelling an acquiring authority to initiate eminent domain proceedings." Accordingly, we discuss appellants' first three issues together and begin with the taking issue.

## A. The district court erred in granting summary judgment on the taking issue on this record.

Under the Fifth Amendment of the United States Constitution and article I, section 13, of the Minnesota Constitution, the government may not take private property for public use without just compensation. The Fifth Amendment "applies to state and local governments through the due process clause of the [F]ourteenth [A]mendment." *Caponi v. Carlson*, 392 N.W.2d 591, 594 (Minn. App. 1986), *rev. denied* (Minn. Oct. 29, 1986). "Whether a government entity's action constitutes a taking is a question of law that we review de novo." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 631 (Minn. 2007).

Appellants argue that the "flooding of [their] property constitutes a physical taking by the city." In their brief to this court, appellants assert that "[a]ny physical intrusion that places a property under indefinite servitude constitutes a taking, even if flooding is not constant." The city responds that the district court properly determined that no taking occurred because the flooding was only a "temporary limitation[]" on appellants' property.

Minnesota law defines a "taking" as "every interference, under the power of eminent domain, with the possession, enjoyment, or value of private property." Minn. Stat. § 117.025 (2022); *see also Hebert v. City of Fifty Lakes*, 744 N.W.2d 226, 229 (Minn. 2008) ("A de facto taking is defined as a taking in which an entity clothed with

13

eminent-domain power substantially interferes with an owner's use, possession, or enjoyment of property." (quotation omitted)). Any "permanent physical occupation" authorized by the government is a taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *Spaeth*, 344 N.W.2d at 821. Accordingly, this court has held that when a city uses private property as a holding pond for its stormwater system, resulting in permanent flooding, the city has taken property and just compensation is required. *Caponi*, 392 N.W.2d at 595-96 (holding that a city took an appellant's private land when it installed culverts and caused permanent flooding, thus using a portion of private property as a stormwater-retention pond). Here, appellants offer no evidence that the city has permanently flooded their property.

If flooding is intermittent, a somewhat different analysis is required. The Minnesota Supreme Court defines a taking in this context as "any *substantial* interference with private property that destroys or lessens its value, or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed." *Nelson v. Wilson*, 58 N.W.2d 330, 335 (Minn. 1953) (emphasis added) (quotation omitted). When the government's action causes flooding that is less than a substantial interference, the government action does not amount to a taking. *Id.* The proper remedy for occasional flooding is damages based on tort law. *Id*. "Whether occasional flooding is of such frequency, regularity, and permanency as to constitute a [t]aking and not merely a

14

temporary invasion . . . is a question of degree, and each case must stand on its own peculiar facts." *Id.*[6]

For example, in *Nelson*, the government built a dam; some of the affected property was not permanently flooded but "remained flooded and wet for several years." 58 N.W.2d at 332, 335. The supreme court affirmed the district court's decision after a trial that the flooding was frequent, regular, permanent, and constituted a taking. *Id.* Similarly, in *Spaeth*, the supreme court affirmed a district court's determination after a trial that the City of Plymouth took Spaeth's property when it used it as a stormwater holding pond because, although the flooding was intermittent, "the evidence show[ed] more than occasional water accumulation" and "Spaeth's property [had] generally remained flooded for approximately three years." 344 N.W.2d at 821-22.

On the other hand, in *Blaine v. City of Sartell*, this court affirmed the district court's grant of summary judgment for the City of Sartell on a taking claim based on overflow from Sartell's drainage ditch. 865 N.W.2d 723, 724, 729 (Minn. App. 2015). This court cited evidence that flooding occurred twice on Blaine's property and receded within a few days. *Id*. at 725, 729. We concluded that the flooding was not "of such frequency, regularity, and permanency as to constitute a taking." *Id*. at 729.

Here, appellants' theory is that the city included the pond as part of a stormwater-management system and caused a permanent "flooding condition" on their

---

[6] We note that this test is distinct from the substantial-invasion test used to determine whether there is a taking by nonphysical appropriation, such as airport noise. *See Alevizos v. Metro. Airports Comm'n*, 216 N.W.2d 651, 662 (Minn. 1974).

property. They argue that the city's use of the pond for stormwater drainage has created a servitude that, although intermittent, is of an indefinite duration because the pond has no outlet, natural or mechanical.

Appellants cite *Spaeth,* arguing that "[p]ermanent in this context refers to a servitude of indefinite duration, even if intermittent," and contend that the permanent risk of flooding created an indefinite servitude on the property such that it amounts to a taking. 344 N.W.2d at 822 (quotation omitted). Appellants emphasize that, when viewed favorably to them, the evidence shows that the risk of flooding is permanent and that flooding is likely to recur. The city argues that "appellants' taking analysis is novel and unsupported in law."[7]

Indeed, no Minnesota caselaw recognizes that a permanent risk of flooding amounts to a constitutional taking or that "risk of flooding" is a substantial interference with use and enjoyment of property. As noted above, existing caselaw has recognized that intermittent flooding may amount to a constitutional taking where it is a substantial interference with the owner's use and enjoyment of property. *Nelson*, 58 N.W.2d at 335. We also note that the term indefinite servitude, as discussed in *Spaeth*, relates to intermittent flooding, not a

---

[7] The city also argues that we should not consider appellants' argument that the risk of flooding is a constitutional taking because appellants did not raise the theory in district court. The city is correct that a party cannot present a new theory for the first time on appeal. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). But appellants made this argument in their memorandum in opposition to the city's motion for summary judgment, saying that the city had "taken their property rights by . . . subjecting [the property] to a permanent risk of flooding."

permanent risk of flooding.[8] With no direction from our supreme court, we refuse appellants' invitation to extend the law to hold that the permanent risk of flooding, without more, amounts to a constitutional taking. *See Tereault v. Palmer,* 413 N.W.2d 283, 286 (Minn. App. 1987) (stating that "the task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court"), *rev. denied* (Minn. Dec. 18, 1987). We conclude, however, that intermittent flooding when combined with evidence of a permanent risk of flooding may amount to a taking, depending on the frequency, regularity, and permanency of the flooding. *See Nelson*, 58 N.W.2d at 335. In short, evidence of the permanent risk of flooding is relevant to a district court's legal determination of whether intermittent flooding constitutes a taking of appellants' property.

With this caselaw in mind, we consider the district court's conclusion that there was "no substantial interference with the [appellants'] use and enjoyment of the property because any high-water levels have been infrequent and insubstantial," making the flooding "more akin to temporary, irregular invasion."

The district court's determination that the pond's flooding of appellants' property was not a "substantial interference with the use or enjoyment" of their property rested on the following evidence: "water from the pond has never entered the home" and "high water levels effectively inundated the property on three occasions"—most recently in 2019. The district court also cited evidence that appellants' patio and lawn were "submerged" in 2017

---

[8] The term "indefinite servitude" is also used in regulatory-takings claims, such as the airport-noise cases filed by landowners. *See United States v. Causby*, 328 U.S. 256, 266-67 (1946) (determining that "frequent, low-level flights" over a property constituted an indefinite servitude). But this is not a regulatory-taking case.

and that their backyard and deck posts were submerged in 2019. Again, because "there has been no interference with the home itself," the district court found "no facts in the record giving rise to a genuine issue as to the elements of taking."

We cannot affirm this determination on summary judgment. First, while relevant, the lack of damage to appellants' home is not dispositive. As seen in *Nelson*, 58 N.W.2d at 335, and *Spaeth*, 344 N.W.2d at 822, government conduct that leads to intermittent flooding of land may be sufficient to establish a constitutional taking. Second, whether the pond's flooding of appellants' property three times in ten years amounts to a taking is a "question of degree" that depends "on its own peculiar facts." *Nelson*, 58 N.W.2d at 335. Although the district court mentioned the "frequency" of the flooding as three times in ten years, it did not discuss the regularity or the permanency of the flooding. The district court also did not address the evidence that the pond created a permanent risk of flooding on appellants' property and that the pond is likely to flood again, as stated in appellants' expert report. The city's four WRMPs over nearly 40 years and the city's landlocked-basin-sensitivity analysis provide similar evidence. Indeed, based on this evidence, the city has recommended but cannot yet fund the installation of an outlet to manage water levels and avoid flooding of adjacent properties, one of which is appellants' property.

Based on our review of the evidence submitted on summary judgment and viewed in the light most favorable to appellants, the city's use of the pond to manage stormwater has resulted in intermittent flooding of appellants' property and has created a permanent risk of flooding. The flooding here is not as frequent as the flooding that lasted several

years in *Nelson*, 58 N.W.2d at 335, or *Spaeth*, 344 N.W.2d at 822. But it is more frequent than the flooding in *Blaine*, which occurred twice and receded within a few days. 865 N.W.2d at 725.

Appellants argue that the evidence of intermittent flooding and risk of flooding creates a question of fact for trial. We agree that these facts give rise to conflicting inferences about the permanency of intermittent flooding and that, on summary judgment, a district court must draw inferences in appellants' favor and must not weigh the evidence. *Senogles*, 902 N.W.2d at 42; *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997) ("[T]he function of the district court on a motion for summary judgment is to not weigh the evidence."). Because appellants presented evidence from which the district court could determine that the intermittent flooding of their property by the pond was of a sufficient degree of frequency, regularity, and permanency and that the pond created a permanent risk of flooding, the district court must determine whether these "particular facts" constitute a taking. Because the district court overlooked the "question of degree" raised by the evidence submitted, failed to draw inferences in appellants' favor, and improperly weighed the evidence, it inappropriately granted summary judgment.

Thus, we reverse summary judgment on the taking issue for both the eminent-domain and inverse-condemnation claims. In doing so, we offer no opinion about the district court's ultimate determination of the taking issue. We also note that whether a taking has occurred is a question for the district court, not a jury. *City of Mankato v. Hilgers*, 313 N.W.2d 610, 612 (Minn. 1981). Accordingly, we remand this issue for further proceedings not inconsistent with this court's decision.

19

Because we remand the taking issue for a decision on the merits, we address a related issue. Appellants ask us to reject the district court's decision that no taking occurred based on the district court's comment that appellants "have not appraised the home since its purchase in 2007, so [appellants] have not given rise to a fact-question as to whether there has been a diminution in value." Appellants first point out that they submitted evidence of a decrease in property value because of the flooding history and ongoing flood risk. Second, appellants correctly point out that, while caselaw requires a decrease in value when there is a taking involving the government regulation of property, that requirement does not apply when "government action results in a permanent physical appropriation or occupation of property" as appellants allege here. *Spaeth*, 344 N.W.2d at 821. The supreme court in *Spaeth* held that the decrease-in-value requirement "need not be applied to determine whether a compensable taking has occurred where . . . [the] government physically appropriates property as planned or when government activity results in a permanent physical occupation" because, when there is permanent physical appropriation based on government action, "there certainly has been a taking." *Id.* Because appellants exclusively argue that the taking occurred by physical appropriation, the district court erred in relying on the absence of an appraisal to determine whether a taking occurred.

### B. Appellants' request for a writ of mandamus relates to their eminent-domain and inverse-condemnation claims.

Under Minn. Stat. § 586.01 (2022), a "writ of mandamus may be issued to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station." The district

court granted summary judgment to the city on appellants' mandamus claims for eminent domain and inverse condemnation, explaining that appellants did "not show[] that the city failed to exercise a duty clearly imposed by law by failing to maintain the pond." The district court also determined that "[e]ven if the city did have a duty imposed by law [appellants] have not demonstrated they have suffered a public wrong specifically injurious to them" because the flooding also impacts their neighbors.

To receive a writ of mandamus, appellants must show (1) the city "failed to exercise a duty imposed by law; (2) due to this failure, [appellants were] specifically injured by a public wrong; and (3) there is no adequate alternative legal remedy." *Chanhassen Chiropractic Ctr., P.A. v. City of Chanhassen*, 663 N.W.2d 559, 562 (Minn. App. 2003), *rev. denied* (Minn. Aug. 5, 2003).

Appellants argue that the district court misanalysed the first element because their mandamus claims stem from the city's "failure to commence condemnation" and they do not seek to compel the city "to regulate the pond." The city does not defend the district court's analysis of the first mandamus element. Rather, the city asks us to affirm the district court's grant of summary judgment on appellants' mandamus claims because, "without a taking," the mandamus claims fail. The city also argues that the district court correctly rejected mandamus on the second element.

We consider each of the mandamus elements in turn. On the first element, failure to perform an official duty clearly imposed by law, we agree with appellants that the mandamus claims concern the city's duty to initiate condemnation proceedings, which, when triggered, is a duty clearly imposed by law. A writ of mandamus may be used to

21

compel the government to exercise eminent domain through condemnation of private property, known in this context as "inverse condemnation." *Nolan*, 673 N.W.2d at 492. While appellants contend that the city also failed to maintain the pond, this maintenance duty is not subject to mandamus because it is not clearly imposed by law.

On the second element, specific injury to appellants, the district court is correct that it is undisputed that the pond's flooding harmed many neighboring properties around the pond, not only appellants' property. But appellants nonetheless offered evidence of specific injury to their own property—physical appropriation by intermittent flooding of the pond used in the city's stormwater-management system. Neither the city nor the district court cites any caselaw establishing that the second element requires the plaintiff in a mandamus action to be the only party injured.

The district court did not discuss the third element requiring no adequate alternative legal remedy. Appellants' brief to this court states that they are pursuing "claims for damages based on nuisance and trespass in the alternative to their taking and inverse condemnation claims." We conclude that, if appellants' tort claims are barred by discretionary immunity, appellants satisfy the third element. And if appellants prevail on their constitutional-taking claim, then only inverse condemnation through a writ of mandamus can provide an adequate remedy. *Nelson*, 58 N.W.2d at 335 (tort claims provide a remedy for temporary and occasional flooding that is not permanent). Thus, it was premature to grant summary judgment on the merits of appellants' mandamus claim.

**C.** **Appellants' attorney-fees claim is tied to their eminent-domain and inverse-condemnation claims.**

Count III of appellants' complaint seeks an award of attorney fees under Minn. Stat. § 117.045, which allows a district court to award attorney fees to the prevailing party in eminent-domain proceedings. Because the district court dismissed appellants' eminent-domain and inverse-condemnation claims, it also denied appellants' claim for attorney fees. As the district court stated, the attorney-fees claim depends on whether the claims for eminent domain and inverse condemnation survive summary judgement. For the reasons already discussed, we reverse the district court's decision on counts I, II, and III.

**II.** **The district court erred by determining that the city was immune from liability for appellants' tort claims.**

Appellants contend that they have a right to pursue their tort claims for nuisance and trespass (counts IV and V) in the alternative to their claims for a constitutional taking. The district court granted summary judgment for the city on the tort claims. The district court first determined that "the [city's] conduct at issue is discretionary" and then concluded that appellants' "nuisance and trespass claims are barred by statutory immunity."[9]

Municipal liability for torts claims is governed by Minn. Stat. § 466.02 (2022), which provides that "every municipality is subject to liability for its torts and those of its

---

[9] "Minnesota law recognizes two forms of governmental immunity: statutory immunity and common law official immunity." *Kariniemi v. City of Rockford*, 882 N.W.2d 593, 599 (Minn. 2016). Although the exercise of discretion is relevant to both official and statutory immunity, different types of discretion are at issue, and "discretion has a broader meaning in the context of official immunity." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). The district court determined that "[c]ommon law official immunity does not apply in this case." The city did not appeal this determination. As a result, we do not consider the district court's analysis of official immunity.

23

officers, employees and agents acting within the scope of their employment or duties." But section 466.03 provides many exceptions, one of which is for discretionary functions, and states that municipalities are immune from liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6. "Determining whether statutory immunity applies requires a careful examination of the challenged governmental activity." *Angell v. Hennepin Cnty. Reg'l Rail Auth.*, 578 N.W.2d 343, 346 (Minn. 1998). The city has the burden of proving "that it is immune under the discretionary function exception." *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 722 n.6 (Minn. 1988).

There are two steps to determine whether government conduct is immune under subdivision 6. The first step is to "identify the conduct at issue," and the second step is to decide whether the "conduct was the result of a discretionary function and thus is immune, or an operational function not entitled to immunity." *Id.* "[A] defendant relying upon an immunity bears the burden of proving [they fit] within the scope of the immunity." *Rehn v. Fischley*, 557 N.W.2d 328, 333 (Minn. 1997). We consider each step of the immunity analysis in turn.

### A.     The Challenged Conduct

The conduct at issue for the nuisance and trespass claims, as raised by appellants, is the city's maintenance of the pond as well as the city's approval of additional development around the pond, which, appellants argue, increased the impervious surfaces in the pond watershed and increased flooding. The district court identified the challenged conduct as the city's decision not to install an outlet to regulate the water level of the pond.

In their brief to this court, appellants contend that the conduct at issue is the city's overall regulation and management of the pond, not just the city's decision not to install an outlet. In fact, appellants concede in their brief to this court that the city's decision not to install an outlet to regulate the pond's water level is a planning decision based on economic and political factors and that the city is therefore immune from tort liability for that decision. Appellants' focus on pond maintenance and city-planning decisions adheres to appellants' position throughout this case. In the complaint, appellants asserted that the city allowed "development that contributes to increased runoff" and damaged their property. In their response to the city's motion for summary judgment, appellants argued that the city is liable in tort because of its "complete neglect of any operational decisions to regulate, manage, and maintain [the pond] to prevent increasing its flood risk and causing flooding."

Accordingly, we conclude the challenged conduct is the city's maintenance of the pond as well as the city's planning decisions approving development that increased impervious surfaces around the pond.

### B.    Whether the Challenged Conduct Is a Discretionary Function

The discretionary-function exception to municipal tort liability immunizes government conduct or decisions that are based on "a balancing of political, social, and economic factors." *Angell*, 578 N.W.2d at 346. These are known as "planning-level decisions." *Conlin v. City of St. Paul*, 605 N.W.2d 396, 400 (Minn. 2000). On the other hand, "operational or day-to-day decisions involving the application of scientific or technical skills are not protected by statutory immunity." *Angell*, 578 N.W.2d at 346. Operational functions are "those involving day-to-day operations of government, the

25

application of scientific and technical skills, or the exercise of professional judgment." *Schroeder v. St. Louis County*, 708 N.W.2d 497, 504 (Minn. 2006).

The district court determined that the city's decision not to install an outlet was discretionary because "the evidence and testimony reveal a broad and discretionary decision making process regarding maintaining water levels" and "[m]any political, ecological, and economic factors are considered, and many moving parts must come together to prioritize and implement WRMP goals." As discussed above, appellants argue that the district court did not correctly identify the government conduct at issue. We agree.

Turning to appellants' claims challenging pond maintenance and city-planning decisions related to impervious surfaces around the pond, appellants contend that, "[a]t a minimum, there is a fact question precluding summary judgment." The city argues that summary judgment is appropriate because its "conduct—whether allowing development in the area, or its decision not to install a drainage outlet—involves the long-term planning and management of its water resources, including environmental, political, and practical engineering considerations." Specifically, the city argues that the "record demonstrates that the city is faced with the task of prioritizing many competing demands on . . . its limited resources" when it comes to pond maintenance and has to "take into account downstream impacts, limited resources, and citizen concerns." The city also argues that the record shows that the city's decisions to approve development "involve[] policy making," given that city staff "evaluate proposed developments, utilizing their various professional experience, specialized education, and discretion, and then make recommendations to the City Council for approval."

26

First, we consider whether the city's maintenance of the pond is a discretionary function involving planning-level decisions. The city's policies about maintaining its stormwater-management system are in the WRMPs, and, under the 2019 WRMP, one relevant goal was to "[m]inimize flooding potential while [also] minimizing, to the greatest extent practical, the public capital expenditures necessary to control excessive volumes and rates of runoff." The city's director of public works testified that the city "perform[s] reactionary maintenance" and does not have "a routine maintenance schedule" but will check on a pond if it "get[s] a call" and would "stop out and look at anything that would need to be addressed on the inlets." He also explained that the city's decision to increase a pond's capacity or install an outlet would require looking at "a number of different factors," including "downstream impacts, public input," as well as "political, social, economic, [and] financing" factors.

Accordingly, the city met its burden to show that its maintenance of the pond, specifically, its decisions about ongoing pond maintenance, including installation of an outlet, are planning-level decisions that involve balancing many factors and the use of professional judgment—the hallmarks of discretionary functions. *See, e.g.*, *Chabot v. City of Sauk Rapids*, 422 N.W.2d 708, 709, 711 (Minn. 1988) (holding city's decision not to remedy stormwater-holding pond by making costly repairs was "clearly of a policy-making nature" and immune from tort liability as a discretionary function); *Christopherson v. City of Albert Lea*, 623 N.W.2d 272, 276-77 (Minn. App. 2001) (affirming summary judgment for city and holding city's decision not to make capital improvements to sewer system was a policy-making decision protected by discretionary immunity). Thus, the city's

27

maintenance of or improvements to the pond is a discretionary function and is therefore protected by statutory immunity.

Second, we address whether the city met its burden to show that its development and planning decisions that increased impervious surfaces around the pond are discretionary functions. The city submitted evidence by the director of public works who discussed the city's decision-making process on new development. He testified that the city reviews and approves new development, such as "adding a structure" and that the city "would require the current rules and ordinances to be followed." The director of public works added that the city council has authority to "set" or act on ordinances, such as "hard surface coverage limit[s]," with recommendations from, generally, the planning department. The director of public works added that he "can't speak to that on behalf of planning."

The director of public works explained that any permits allowing property owners to build new structures would be reviewed by the "community development" or the "planning" departments. But the director added that he "can't speak to all of those." He added that "if a home were being built," in addition to current regulations, public works would look at "how the [pond's] water would need to be controlled [as] part of [the] stormwater management plan[; the pond's] rate and volume" and the decision would depend on "each individual situation."

When asked about specific improvements identified in appellants' expert report, the director denied having any personal knowledge. The city also offered testimony from a city engineer, who testified that he was familiar with one recent construction project in the area

around the pond and that a staff member in his department had reviewed the project "to ensure that the property met stormwater regulations [in] the city" by "review[ing] the grading plans."

After careful review of the record submitted on summary judgment, we conclude that the city submitted evidence on which departments made development decisions but did not "provide[] any evidence as to how [the city or its departments] made the decision for which it claims immunity." *Conlin*, 605 N.W.2d at 402. The city therefore did not meet its burden to show it is entitled to discretionary immunity. *Id.* at 400.

To the extent that appellants are challenging the issuance of permits that affected stormwater runoff or capacity, the city is correct that permitting decisions have, in some cases, been treated as immune discretionary functions. *See Anderson v. City of Minneapolis*, 178 N.W.2d 215, 217 (Minn. 1970) (granting judgment for city on appeal, reasoning that a Minneapolis city employee's act in "issuing the building permit in a doubtful case involved an exercise of discretion" because the employee "had to make a judgment as to whether plans submitted in support of the application for the permit constituted a permissible use of the property in the area involved"); *see also Wilson v. Ramacher*, 352 N.W.2d 389, 392-93 (Minn. 1984) (affirming that, "as a matter of law[,] . . . the city was not liable" under the discretionary-function exception for the "issuance of any permits to the downstream owners to put fill on their land" though doing so diverted surface waters onto appellant's land).

But permitting is only part of the challenged conduct. Appellants' tort claims focus on damage to their property caused by the city's planning and development decisions that

increased impervious surfaces around the pond. At best, the city offered evidence suggesting that the city has a review process for new construction and how that process worked for one construction project. But the city did not provide evidence about how it balanced political, social, or economic factors to make planning and development decisions, much less how those decisions related to impervious surfaces and stormwater management. Indeed, the one witness on whom the city relied stated that he could not speak to a hardcover-surface limit or how the planning department evaluated hardcover during the permitting process. Thus, while it may seem highly likely to this court that the city balanced political, economic, and other considerations when it approved development around the pond and increased impervious surfaces, the absence of any evidence in support of this position leads us to reverse.

In sum, the city is immune from tort liability for its decision to not install an outlet and for its regular reactive maintenance conduct involving the pond. But, on this record, the city failed to show that the conduct challenged by these appellants involving the approval of development that increased impervious surfaces around the pond resulted from a discretionary function.

**Affirmed in part, reversed in part, and remanded.**